1

**CERA LLP**
Solomon B. Cera (State Bar No. 099467)
Thomas C. Bright (State Bar No. 169713)
595 Market Street, Suite 1350
San Francisco, CA 94105
Telephone: (415) 777-2230
Email: scera@cerallp.com
Email: tbright@cerallp.com

**NEMATZADEH PLLC**
Justin Solomon Nematzadeh (*pro hac vice forthcoming*)
101 Avenue of the Americas, 9th Floor
New York, NY 10013
Telephone: (646) 417-8379
Email: jsn@nematlawyers.com

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (*pro hac vice forthcoming*)
Gregory K. Arenson (*pro hac vice forthcoming*)
850 Third Avenue, 14th Floor
New York, NY 10022
phone: (212) 687-1980
Email: rkaplan@kaplanfox.com
Email: garenson@kaplanfox.com

*Attorneys for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CASEY'S DISTRIBUTING, INC., on Behalf of Itself and all Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL FOOTBALL LEAGUE, INC.; NATIONAL FOOTBALL LEAGUE PROPERTIES, LLC.; NFL ENTERPRISES LLC; ARIZONA CARDINALS FOOTBALL CLUB LLC; ATLANTA FALCONS FOOTBALL CLUB, LLC; BALTIMORE RAVENS LIMITED PARTNERSHIP; BUCCANEERS TEAM LLC; BUFFALO BILLS LLC; CAROLINA PANTHERS, LLC; THE CHICAGO BEARS FOOTBALL CLUB, INC.; CHARGERS FOOTBALL COMPANY, LLC; CINCINNATI BENGALS, INC.; CLEVELAND BROWNS FOOTBALL COMPANY, LLC; DALLAS COWBOYS FOOTBALL CLUB, LTD.; DETROIT LIONS, INC.; FOOTBALL | Case No. <br><br> **CLASS ACTION** <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF FEDERAL AND CALIFORNIA ANTITRUST AND CALIFORNIA UNFAIR COMPETITION LAWS** |

NORTHWEST LLC; GREEN BAY PACKERS, INC.; HOUSTON NFL HOLDINGS, L.P.; INDIANAPOLIS COLTS, INC.; JACKSONVILLE JAGUARS LLC; KANSAS CITY CHIEFS FOOTBALL CLUB, INC.; LAS VEGAS RAIDERS FOOTBALL LLC; MIAMI DOLPHINS LTD.; MINNESOTA VIKINGS FOOTBALL LLC; NEW ENGLAND PATRIOTS LLC; NEW ORLEANS LOUISIANA SAINTS, LLC; NEW YORK FOOTBALL GIANTS, INC.; NEW YORK JETS FOOTBALL CLUB, INC.; PDB SPORTS, LTD. d/b/a DENVER BRONCOS FOOTBALL CLUB; THE PHILADELPHIA EAGLES FOOTBALL CLUB INC.; PITTSBURGH STEELERS SPORTS INC.; THE RAMS FOOTBALL COMPANY LLC; SAN FRANCISCO FORTY NINERS II, LLC; TENNESSEE FOOTBALL, INC.; WASHINGTON FOOTBALL, INC.; and FANATICS, INC.

Defendants.

# TABLE OF CONTENTS

**Page(s)**

I.   NATURE OF THE ACTION ................................................................................. 1

II.  PARTIES .......................................................................................................... 3

    A.   Plaintiff ................................................................................................... 3

    B.   Defendants ............................................................................................. 3

III. JURISDICTION, VENUE, AND INTERSTATE COMMERCE ............................. 9

IV.  FACTS ............................................................................................................. 11

    A.   NFLP Has The Power And Authority To Decide Who Can Become An NFL Licensee. ................................................................................................. 11

    B.   Fanatics Is a Dominant and Growing Online Retailer with Substantial Leverage Over The NFL Licensed Product Market. ............................................... 13

    C.   Online Retail is a Market Separate and Distinct from Brick-and-Mortar Retail. ....... 15

    D.   Casey's and Others Have Been Excluded from Selling on Amazon's Platform .......... 18

    E.   The NFLP's Policy Prohibiting Retailers from Selling NFL Licensed Products on Amazon's TPOM Together with the Merchandise Agreement Violate The Antitrust Laws And Harm Competition............................................................. 32

    F.   No Procompetitive Justifications Excuse Defendants' Collusive Conduct. ............. 36

V.   THE RELEVANT ANTITRUST MARKET & MARKET POWER ......................... 38

    A.   NFLP's Monopoly or Market Power ........................................................ 39

    B.   Amazon's Monopoly or Market Power ..................................................... 40

    C.   Fanatics' Monopoly or Market Power ...................................................... 41

VI.  DEFENDANTS WILLFULLY AND IMPROPERLY ACQUIRED OR MAINTAINED THEIR MONOPOLY POWER THROUGH ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT ................................................................................................... 43

    A.   NFLP.................................................................................................... 43

    B.   Fanatics ................................................................................................ 45

VII. PLAINTIFF IS ENTITLED TO INJUNCTIVE RELIEF ..................................... 46

VIII.   CLASS ACTION ALLEGATIONS ............................................................. 48

     A.   Class Definition ............................................................................. 48

     B.   Class Certification Requirements Under Rule 23 ......................... 48

IX.   CAUSES OF ACTION .......................................................................... 51

FIRST CAUSE OF ACTION Sherman Act § 1 –
     Conspiracy in Restraint of Trade  (As to All Defendants)....................... 51

SECOND CAUSE OF ACTION Sherman Act § 2 –
     Monopolization  (As to All Defendants) .................................................. 52

THIRD CAUSE OF ACTION Sherman Act § 2 –
     Attempted Monopolization  (As to All Defendants)................................ 54

FOURTH CAUSE OF ACTION Sherman Act § 2 –
     Conspiracy to Monopolize  (As to All Defendants) ............................... 55

FIFTH CAUSE OF ACTION Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq.*) –
     Conspiracy in Restraint of Trade  (As to All Defendants)....................... 56

PRAYER FOR RELIEF ................................................................................... 62

Plaintiff Casey's Distributing, Inc. ("Casey's" or "Plaintiff") individually and on behalf of all others similarly situated, by and through its undersigned counsel, and upon personal knowledge as to facts known to Plaintiff and upon information and belief as to all other facts following investigation of counsel alleges as follows against Defendants.  Defendants are professional football teams, the NFL and affiliated entities, and Fanatics, Inc. ("Fanatics") (collectively hereinafter "Defendants").  Plaintiff's counsel's investigation into the factual allegations contained herein is continuing.  Many of the relevant facts are known only by Defendants or are exclusively within their custody and control.  Plaintiff believes that substantial evidentiary support exists for the allegations set forth herein and that such evidence will be available after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Every year, consumers spend billions of dollars on NFL licensed products.  Many of these transactions take place through online channels, especially Amazon.com, Inc.'s ("Amazon") online retail platform.  In fact, Amazon's third-party online marketplace ("TPOM") serves as a sole source of income for many small competitors who sell NFL licensed products to consumers.  Amazon's TPOM is the most important platform for small businesses such as Plaintiff Casey's to participate in the online retail market for sales of NFL licensed products.  But this year, the NFL Teams and Fanatics entered into various agreements that choke that competition off of Amazon's TPOM and channel it to Fanatics, a gargantuan sporting goods licensee, manufacturer, wholesaler, distributor, and retailer, which not only holds an NFL license to manufacture NFL licensed products, distributes those products, and retails those products, but is partially owned by the NFL.  These agreements violate the antitrust laws.

2.    Fanatics' appetite for growth cannot be overstated.  Fanatics' value has tripled in the past year alone, now estimated to be $18 billion.  Fanatics has used its funding to buy up competing licensees of NFL products, slowly securing its dominance in the licensed sporting goods market, not the least of which is NFL licensed products.

3.    The NFL aids and abets Fanatics because it invested $95 million in Fanatics to become a minority equity shareholder.  As Fanatics' value grows, so does the value of the NFL's equity share in Fanatics.  Thus, it is in the NFL's interest to assist Fanatics in its campaign to usurp as much of the

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF ANTITRUST AND UNFAIR COMPETITION LAWS

online retail space as possible.  And Amazon's enormous online retail platform, including its TPOM, was a logical candidate to target for growth.

4.      Fanatics now dominates Amazon's online retail space as a result of the agreements described herein.  As alleged herein, at least two licensees have agreements with Fanatics (also a licensee) that mandates that the licensees not sell to entities that will sell the products on or to Amazon as well as to certain online retailers.  Indeed, Casey's has seen a written agreement that appears to be between Fanatics and its horizontally competing licensees to group boycott entities, such as Casey's, from competing with Fanatics and its colluding licensees in selling products on or to Amazon. Fanatics captured this dominance by excluding smaller competitors like Casey's through the NFL's recently implemented restrictions that prohibit competing retailer entities like Casey's from selling on Amazon's TPOM, unless approved by the NFL to do so—at the NFL's sole discretion.  But in order to even be considered by the NFL, the NFL requires applicants to release all legal rights against it, albeit with no promise in return that the NFL will allow—in its sole discretion—an applicant access to Amazon's TPOM.  The agreements described herein are designed to allow the NFLP, Fanatics, and the constituent teams to reach downwards to attempt to restrict the conduct of retailers – including those that lack privity with the NFLP, Fanatics, and the constituent teams -- that horizontally compete with them.

5.      Casey's elected to retain its rights instead of risk giving them up for a hollow possibility of being allowed to sell on Amazon's TPOM because it recognized the anticompetitive nature of this restriction.  Instead, it elected to bring this lawsuit seeking an injunction to restore competition on Amazon's TPOM to the status quo.

6.      Casey's brings this action on behalf of itself and other online retailers of NFL Licensed Products (hereinafter, "NFL Licensed Products") who have been denied the opportunity to sell on Amazon's TPOM due to Defendants' anticompetitive conduct in violation of the Sherman Act, 15 U.S.C. §§ 1, 2, and California state laws and seeks only injunctive and declaratory relief against Defendants.

## II.      PARTIES

### A.      Plaintiff

7.       Plaintiff Casey's is a Nebraska corporation with its principal address at 8921 J Street, #300, Omaha, Nebraska, 68127.  Casey's product line primarily focuses on licensed hardgoods, which includes automotive accessories, banners, blankets, collectibles, displays, full-size authentic and mini helmets, flags, home and office products, toys, drinkware, and items for dining, the kitchen, and tailgating.  Casey's also sells licensed apparel.  Casey's purchased NFL licensed hardgoods directly from WinCraft, which was acquired by Fanatics on or around December 2020, and other licensees during the class period, as defined below.  Casey's sells a significant amount of NFL Licensed Products to California-based customers.  Further, Casey's purchases NFL Licensed Products from between five and ten California-based suppliers.

### B.      Defendants

8.       Defendant **National Football League, Inc.** (the "NFL") is an association of 32 professional football teams in the United States.  Each of the member teams, headquartered in various cities across the country, are separately owned and operated, act in their own economic self-interest, and compete in many respects with each other.  The NFL has its headquarters at 345 Park Avenue, 7th Floor, New York, NY 10154.

9.       Defendant **National Football League Properties, LLC** ("NFLP") is a Delaware Limited Liability Corporation with its headquarters at 345 Park Avenue, New York, New York 10154.[1]  NFLP serves as the representative of the National Football League and its member professional football teams ("Team" or "Teams") for the licensing of their trademarks and logos ("NFL Marks"), which include, among others, the NFL shield, the words SUPER BOWL and PRO BOWL, the Super Bowl and Pro Bowl logos, and the Team names, nicknames, colors, symbols, emblems, helmet designs, and uniform designs.  To that end, the NFL and each Team have granted

---

[1]                                                                  https://www.dnb.com/business-directory/company-profiles.nfl_properties_llc.da85ba3b2befbb9d9981288bcb8a2997.html (last visited October 4, 2021); *see also*  https://www.nfl.info/NFLConsProd/Welcome/cpAgreement.htm  (last visited  October  4, 2021).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF ANTITRUST AND UNFAIR COMPETITION LAWS

NFL Properties the exclusive right to license the Teams' trademarks and related intellectual property. In addition to its New York location, Defendant NFLP maintains an office at 10950 Washington Blvd., Suite 100, Culver City, California 90232.[2]

10.     Defendant **NFL Enterprises LLC** is a Delaware limited liability company with its principal place of business at 280 Park Avenue, New York, NY 10017. NFL Enterprises owns the "NFLShop.com" domain name.

11.     Defendant **Arizona Cardinals Football Club LLC** is a Delaware limited liability company with its principal place of business at 8701 South Hardy Dr., Tempe, AZ 85284. The Arizona Cardinals are a professional football team and member of the NFL.

12.     Defendant **Atlanta Falcons Football Club, LLC** is a Georgia limited liability company with its principal place of business at 4400 Falcon Pkwy, Flowery Branch, GA 30542. The Atlanta Falcons are a professional football team and member of the NFL.

13.     Defendant **Baltimore Ravens Limited Partnership** is a Maryland limited partnership with its principal place of business at 1101 Russel St., Baltimore, MD 21230. The Baltimore Ravens are a professional football team and member of the NFL.

14.     Defendant **Buccaneers Team LLC** is a Delaware limited liability company with its principal place of business at 1 Buccaneers Pl., Tampa, FL 33607. The Tampa Bay Buccaneers are a professional football team and member of the NFL.

15.     Defendant **Buffalo Bills LLC** is a Delaware limited liability company with its principal place of business at 1 Bills Dr., Orchard Park, NY 14127. The Buffalo Bills are a professional football team and member of the NFL.

16.     Defendant **Carolina Panthers, LLC** is a North Carolina limited company with its principal place of business at 800 South Mint Street, Charlotte, NC 28202. The Carolina Panthers are a professional football team member of the NFL.

---

[2] https://www.dnb.com/business-directory/company-profiles.nfl_properties_llc.101f8c221a0154b21d3b78f972eda710.html (last visited October 6, 2021). *See also* https://www.buzzfile.com/business/Nfl-Network-310-840-4635 (last visited October 6, 2021).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF ANTITRUST AND UNFAIR COMPETITION LAWS

17.     Defendant **The Chicago Bears Football Club, Inc.** is a Delaware corporation with its principal place of business at 1000 Football Drive, Lake Forest, IL 60045. The Chicago Bears are a professional football team and member of the NFL.

18.     Defendant **Chargers Football Company, LLC** is a California limited liability company with its principal place of business at 3333 Susan St., Costa Mesa, CA 92626. The Los Angeles Chargers are a professional football team and member of the NFL.

19.     Defendant **Cincinnati Bengals, Inc.** is an Ohio corporation with its principal place of business at 1 Paul Brown Stadium, Cincinnati, OH 45202. The Cincinnati Bengals a professional football team and member of the NFL.

20.     Defendant **Cleveland Browns Football Company, LLC** is a Delaware limited liability company with its principal place of business at 76 Lou Groza Blvd., Berea, OH 44017. The Cleveland Browns are a professional football team and member of the NFL.

21.     Defendant **Dallas Cowboys Football Club, Ltd.** is a Texas limited liability company with its principal place of business at 1 Cowboys Way, Ste. 100, Frisco, TX 75034. The Dallas Cowboys are a professional football team and member of the NFL.

22.     Defendant **Detroit Lions, Inc.** is a Michigan corporation with its principal place of business at 222 Republic Dr., Allen Park, MI 48101. The Detroit Lions are a professional football team and member of the NFL.

23.     Defendant **Football Northwest LLC** is a Washington limited liability company with its principal place of business at 12 Seahawks Way, Renton, WA 98056. The Seattle Seahawks are a professional football team and member of the NFL.

24.     Defendant **Green Bay Packers, Inc.** is a Wisconsin corporation with its principal place of business at 1265 Lombardi Ave., Green Bay, WI 54304. The Green Bay Packers are a professional football team and member of the NFL.

25.     Defendant **Houston NFL Holdings, L.P.** is a Delaware limited partnership with its principal place of business at 2 NRG Park, Houston, TX 77054. The Houston Texans are a professional football team and member of the NFL.

26.     Defendant **Indianapolis Colts, Inc.** is a Delaware corporation with its principal place of business at 7001 West 56th St., Indianapolis, IN 46254. The Indianapolis Colts are a professional football team and member of the NFL.

27.     Defendant **Jacksonville Jaguars LLC** is a Florida limited liability company with its principal place of business at 1 TIAA Bank Field Dr., Jacksonville, FL 32202. The Jacksonville Jaguars are a professional football team and member of the NFL.

28.     Defendant **Kansas City Chiefs Football Club, Inc.** is a Texas corporation with its principal place of business at 1 Arrowhead Dr., Kansas City, MO 64129. The Kansas City Chiefs are a professional football team and member of the NFL.

29.     Defendant **Las Vegas Raiders Football LLC** are a Nevada limited liability company with its principal place of business at 1475 Raiders Way, Henderson, NV 89052. The Las Vegas Raiders (formerly the Oakland Raiders) are a professional football team and member of the NFL.

30.     Defendant **Miami Dolphins Ltd.** is a Florida limited company with its principal place of business at 347 Don Shula Dr., Miami Gardens, FL 33056. The Miami Dolphins are a professional football team and member of the NFL.

31.     Defendant **Minnesota Vikings Football LLC** is a Delaware limited liability company with its principal place of business at 2600 Viking Cr., Eagan, MN 55121. The Minnesota Vikings are a professional football team and member of the NFL.

32.     Defendant **New England Patriots LLC** is a Delaware limited liability company with its principal place of business at 1 Patriot Pl., Foxboro, MA 02035.  The New England Patriots are a professional football team and member of the NFL.

33.     Defendant **New Orleans Louisiana Saints, LLC** is a Delaware limited liability company with its principal place of business at 5800 Airline Dr., Metarie, LA 70003. The New Orleans Saints are a professional football team and member of the NFL.

34.     Defendant **New York Football Giants Inc.** is a New York corporation with its principal place of business at 1925 Giants Drive, East Rutherford, NJ 07073. The New York Giants are a professional football team and member of the NFL.

35.     Defendant **New York Jets Football Club, Inc.** is a Delaware corporation with its principal place of business at 1 Jets Drive, Florham Park, NJ 07932. The New York Jets are a professional football team and member of the NFL.

36.     Defendant **PDB Sports, Ltd. d/b/a Denver Broncos Football Club** is a Colorado limited company with its principal place of business at 13655 Broncos Parkway, Englewood, CO 80112. The Denver Broncos are a professional football team and member of the NFL.

37.     Defendant **The Philadelphia Eagles Football Club Inc.** is a Delaware corporation with its principal place of business at 1 Novicare Way, Philadelphia, PA 19145. The Philadelphia Eagles are a professional football team and member of the NFL.

38.     Defendant **Pittsburgh Steelers Sports Inc.** is a Pennsylvania corporation with its principal place of business at 3400 S. Water St., Pittsburgh, PA 15203. The Pittsburgh Steelers are a professional football team and member of the NFL.

39.     Defendant **The Rams Football Company LLC** is a Delaware limited liability company with its principal place of business at 29899 Agoura Rd., Agoura Hills, CA 91301. The Los Angeles Rams are a professional football team and member of the NFL.

40.     Defendant **San Francisco Forty Niners II, LLC** is a Delaware limited liability company with its principal place of business at 4900 Marie P DeBartolo, Santa Clara, CA 95054. The San Francisco 49ers are a professional football team and member of the NFL.

41.     Defendant **Tennessee Football, Inc.** is a Delaware corporation with its principal place of business at 460 Great Circle Rd., Nashville, TN 37228. The Tennessee Titans are a professional football team and member of the NFL.

42.     Defendant **Washington Football, Inc.** is a Maryland corporation with its principal place of business at 21300 Redskins Park Dr., Ashburn, VA 20147. The Washington Football Team is a professional football team and member of the NFL.

43.     Defendant **Fanatics, Inc.** is a Delaware Corporation, established and headquartered at 8100 Nations Way, Jacksonville, FL 32256, in 2011.  Fanatics is a manufacturer, supplier, distributor, and retailer of licensed sportswear, sports equipment, and merchandise, including NFL Licensed Products.  Fanatics is also a licensee of NFLP.  In July 2016, Fanatics opened a 50,000

7

square foot "West Coast Headquarters" in San Mateo, California, employing over 300 employees.[3]
According to *Business Insider,* Fanatics is "co-headquartered in San Mateo and Jacksonville, Fla."[4]
Fanatics' chief executive officer ("CEO") and chief financial officer ("CFO") are both based in San
Mateo, California.[5]  Fanatics' California-based activities concern, in part, the anticompetitive conduct
alleged herein.  For example, according to *Business Insider*, employees "[i]n the San Mateo offices . . .
work[] on everything from clothing designs to ***e-commerce platforms***."[6]  As indicated in a July 15,
2016, *Business Insider* article announcing the opening of Fanatics' San Mateo offices, "engineers and
product managers from the Bay Area . . . help execute the company's newest tech initiatives and
analyze customer data to figure out ***where*** Fanatics should focus next."[7]  It further noted that
"Fanatics' data team tries to figure out ***where*** and why users are buying merchandise."[8]  In addition to
its work on e-commerce platforms and other technologies, Fanatics operates several in-venue
(stadium-located) retail stores and other retail operations in California, including the Warriors Shop at
the Chase Center in San Francisco, California[9]; the LAFC's retail store at the Banc of America
Stadium in Los Angeles, California[10]; the San Jose Earthquakes' retail store at PayPal Park in San

---

[3] https://www.fanaticsinc.com/history (2016) (last visited June 18, 2021).

[4] https://www.bizjournals.com/sanjose/news/2016/08/31/silicon-valley-in-vr-inside-fanatics-san-mateo.html (last visited October 4, 2021).  *See also* https://www.jaxdailyrecord.com/article/fanatics-setting-up-satellite-office (last visited October 4, 2021) (referring to the San Mateo office as "[i]ts West Coast headquarters").

[5] *Doug Mack*, Linked In, https://www.linkedin.com/in/doug-mack-a65a574/ (last visited Sept. 5, 2021); *Doug Mack*, Kynetic, http://kynetic.com/team/doug-mack/ (last visited Sept. 5, 2021); Mark Basch, *Fanatics Hires Nike Executive as new CFO*, Jacksonville Daily Rec. (Sept. 26, 2019).

[6] https://www.bizjournals.com/sanjose/news/2016/08/31/silicon-valley-in-vr-inside-fanatics-san-mateo.html (last visited October 4, 2021) (emphasis added).

[7] https://www.businessinsider.com/fanatics-moves-to-silicon-valley-2016-7 (last visited October 4, 2021) (emphasis added).

[8] *Id.* (emphasis added).

[9] https://www.nba.com/warriors/news/warriors-fanatics-retail-partnership-20190722 (last visited October 4, 2021).

[10] https://www.lafc.com/news/lafc-announces-omnichannel-retail-partnership-with-fanatics-972 (last visited October 4, 2021) and https://bancofcaliforniastadium.com/ (last visited October 4, 2021).

Jose, California[11]; the San Francisco 49ers' retail store at Levi's Stadium in Santa Clara, California[12]; the San Francisco Giants' retail store at Oracle Park in San Francisco, California[13]; the Sharks Store in the San Jose Sharks' SAP Center in San Jose, California[14]; and a Paris Saint-Germain retail store in the Westfield Century City Mall in Los Angeles, California.[15]

44.     This complaint uses the term "NFL Defendants" to refer collectively to the 32 NFL Teams, the NFL, NFL Properties, and NFL Enterprises.

### III.     JURISDICTION, VENUE, AND INTERSTATE COMMERCE

45.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1337 and Clayton Act, 15 U.S.C. §26.  This Court has supplemental jurisdiction over Plaintiff's state law claims—California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq.*) pursuant to 28 U.S.C. § 1367.  The Court also has subject-matter jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1332, based on the diversity of citizenships between Plaintiff and Defendants and the amount in controversy exceeding $75,000.00.

46.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from any Defendant.

47.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. § 1391 (b), (c), and (d) because during the Class Period, Defendants resided, transacted business, were

---

[11]     https://www.sjearthquakes.com/news/news-san-jose-earthquakes-fanatics-sign-long-term-multichannel-retail-partnershi      (last      visited      October      4,      2021)      and https://www.sjearthquakes.com/fans/teamstore (last visited October 4, 2021).

[12]     https://www.sportsbusinessjournal.com/Journal/Issues/2016/11/21/Facilities/Breaking-Ground.aspx (last visited October 4, 2021) and https://www.levisstadium.com/contact-us/ (last visited October 4, 2021).

[13]     https://www.sportspromedia.com/news/san-francisco-giants-fanatics-merchandise/      (last      visited October 4, 2021) and https://www.mlb.com/giants/ballpark/transportation/ (last visited October 4, 2021).

[14]     https://www.bizjournals.com/sanjose/news/2016/10/06/sharks-expect-fanatics-deal-to-boost-in-arena.html      (last      visited      October      4,      2021)      and      https://sapcentertransport.com/parking-pricing-and-directions/ (last visited October 4, 2021).

[15]     https://sgbonline.com/fanatics-opens-paris-saint-germain-store-in-los-angeles/ (last visited October 4, 2021).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF ANTITRUST AND UNFAIR COMPETITION LAWS

found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

48.     Defendants' conduct was within the flow of, was intended to, and did in fact have a substantial effect on interstate commerce of the United States, including in this District.

49.     During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate railroads, highways, waterways, airways, cable, wires, wireless spectrum, and the U.S. mail, to effectuate their unlawful scheme.

50.     Defendants' manipulation, conspiracy, and conduct alleged herein was in U.S. import/commerce and/or had direct, substantial, and reasonably foreseeable effects on U.S. domestic commerce, within the meaning of the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6(a).

51.     This Court has personal jurisdiction over each defendant because each defendant transacted business, maintained substantial contacts, is located, and/or they or their co-conspirators committed overt acts in furtherance of their illegal conspiracy in the United States, including in this District.  The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

52.      Further, all Defendants have substantial and continuing locations and operations within California that relate, in part, directly to the anticompetitive conduct alleged in this complaint.  Four Teams were based in California when the conspiracy was first implemented, the most of any state.[16] During the relevant time frame, Fanatics maintained a West Coast headquarters (which it now calls its "Innovation Center") in California.  Fanatics' CEO and CFO are both based in San Mateo, California.[17]  All Defendants have engaged in sufficient minimum contacts with both the United States in general and with California in particular.  All Defendants sell and ship millions of dollars worth of NFL Licensed Sports Products to customers in California.  All Defendants have purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise

---

[16] The Las Vegas Raiders moved to Las Vegas, Nevada, from Oakland, California in 2020.

[17] *Doug Mack*, Linked In, https://www.linkedin.com/in/doug-mack-a65a574/ (last visited Sept. 5, 2021); *Doug Mack*, Kynetic, http://kynetic.com/team/doug-mack/ (last visited Sept. 5, 2021); Mark Basch, *Fanatics Hires Nike Executive as new CFO*, Jacksonville Daily Rec. (Sept. 26, 2019).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF ANTITRUST AND UNFAIR COMPETITION LAWS

of jurisdiction over them would comport with due process requirements, including notions of fair play and substantial justice.

IV.     **FACTS**

    A.     **NFLP Has The Power And Authority To Decide Who Can Become An NFL Licensee.**

53.     The NFL Licensed Sports Products industry operates much like other licensed merchandise industries. Trademark owners (e.g., individual sports teams) license their marks to licensees who make products that are then sold to distributors, who then re-sell the products to retailers, who in turn re-sell them directly to consumers.  But instead of competing independently, the teams that comprise the NFL (the "Teams") have formed a cartel to jointly organize the licensing of their marks (as a single group) through Defendant NFL Properties.  Unlike real competitors in an open and competitive marketplace, the Teams' collusive marketing agreements disincentivize competition between the Teams.  *See L.A. Mem'l Coliseum v. Nat'l Football League*, 726 F.2d 1381, 1389 (9th Cir. 1984) (describing the NFL as a "cartel"); *see also Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 1897 (2010) ("The teams compete with one another, not only on the playing field, but to attract fans, for gate receipts, and for contracts with managerial and playing personnel. . . . . [T]he teams compete in the market for intellectual property.").  The NFL's operation as a business cartel is key to understanding the collusive agreements at issue in this complaint.

54.     Another relevant feature of the NFL Licensed Sports Products industry is that firms occupying upstream positions in the supply chain as manufacturers or trademark owners also act as retailers selling directly to consumers.  Although the Teams collectively license their marks to licensees who make products bearing the Teams' logos, those Teams also have historically sold those same products directly to consumers in their online and "brick-and-mortar" fanshops.  The same is true for licensees who manufacture products that they sell to both distributers and fans directly.

55.     The last 20 years have seen a dramatic shift from traditional "brick-and-mortar" businesses to "e-commerce," which is the buying and selling of goods or services using the internet. Although the NFL Teams have historically sold merchandise online through their individual sites, by far the biggest player in the online retail market for NFL Licensed Sports Products is Defendant

Fanatics, Inc.

56.     NFLP serves as the representative of the National Football League ("NFL") and its 32 constituent member Teams for the licensing of their logos, trademarks, emblems, or other indicia ("Intellectual Property").  In this role, the NFLP controls the Intellectual Property of the NFL and its constituent Teams, including merchandising and licensing of NFL products that bear NFL Intellectual Property ("NFL Licensed Products").  For that reason, the NFLP maintains all or substantially all control over how NFL Licensed Products reach consumers, and it does so for the NFL itself and for each of the NFL's thirty-two competing constituent Teams.

57.     Within its authority to issue and renew NFL Intellectual Property Licenses, NFLP has the power to set the price of such licenses.  Through this power to set license prices and exclude competition, NFLP has the ability to determine which, as well as how many, licenses it will issue or renew.  Further, both as part of its authority to set prices and its power to exclude competition, NFLP can determine which individuals or entities can receive renewed licenses.

58.     Prior to the implementation of the anti-competitive scheme alleged herein, non-licensee companies, such as Casey's, were permitted to purchase NFL Licensed Products from licensees and distribute those products to retailers or retail the products online themselves.  As written, the NFL's policies do not mandate that only licensees can retail NFL Licensed Products online.  But in practice through the anti-competitive scheme alleged herein, the NFL Defendants, Fanatics, and colluding licensees are effectuating a system that limits the available online retailers.

59.     The NFL and each of its constituent Teams can retail Licensed Products.

60.     NFL licensees, including but not limited to Fanatics, also compete in retailing Licensed Products.

61.     NFL Licensed Products are also sold at the retail level by various retailers who do not hold a license but who legitimately purchase NFL Licensed Products from licensees.  For example, Casey's does not hold a license but purchases NFL Licensed Products from various licensees.

62.     Previously, even retailers who do not hold NFL licenses, but legitimately purchase NFL Licensed Products have the freedom to retail them on TPOM.

63.     By deciding which individuals or entities can receive NFL Intellectual Property

Licenses, NFLP has the ability to determine the level of competition occurring between and among licensees, including the NFL licensees participating in the NFL Licensed Products market. Further, NFLP has the power to dictate the terms that govern the conduct of these NFL licensees. As part of this power, NFLP has threatened or prevented NFL licensees from selling NFL Licensed Products to those, like Casey's, with interest in retailing NFL Licensed Products on or through Amazon's TPOM. In addition, NFLP has the power to favor certain NFL licensees over others. For example, NFLP has placed Fanatics—with whom the NFL has an investment interest (further described below)—in the favored position of operating or "powering" the NFL's Amazon "storefront" and most of the League's and member Teams' e-commerce websites. In this way, NFLP has ensured that one particular licensee, Fanatics, unlawfully monopolizes the online retail market for NFL Licensed Products.

### B. Fanatics Is a Dominant and Growing Online Retailer with Substantial Leverage Over The NFL Licensed Product Market.

64. Fanatics was launched by Michael Rubin in 2011. Today, Fanatics has relationships with over 1,080 product vendors. Fanatics offers products through its Fanatics and FansEdge brands, as well as sports collectibles and memorabilia through Fanatics Authentic and SportsMemorabilia.com. Fanatics currently operates the e-commerce websites of major professional sports leagues (MLB, NASCAR, NBA, NFL, NHL, PGA, MLS, and UFC), major media brands (CBS Sports, Fox Sports, and NBC Sports), and over 150 collegiate and professional team properties. It operates over 300 online and offline stores, including, but not limited to, Fanatics.com, NFLShop.com, MLBShop.com, and Fansedge.com.

65. In 2014, Fanatics began developing its "vertical commerce" or "v-commerce" business model, pursuant to which Fanatics aimed to produce, manufacture, supply, wholesale, distribute, and retail licensed merchandise, including NFL Licensed Products.

66. Around May 2017, the NFL invested approximately $95 million to acquire a minority equity stake in privately held Fanatics, a licensee that manufactures, supplies, wholesales, distributes, and retails NFL Licensed Products. The NFLP receives a share of Fanatics' monopoly rents through licensing fees and increased royalty revenue, both in absolute dollars and as a percentage of sales. Rubin explained it this way:

They get a cut of everything we sell.  So the more we sell, the more money they/we make and I can tell you, the growth we've seen in both the NFL and MLB in this partnership has been, I think in a lot of ways better than anyone expected.[18]

67.     As a further benefit of this investment and because direct-to-consumer sales generate data about consumers, the NFL was able to leverage the greater consumer traffic going to websites controlled by the NFL Defendants and Fanatics to gather data that would, as Michael Rubin puts it, "drive all aspects of their business."

68.     Since the NFL's investment in Fanatics, and at least in part due to NFLP's and Amazon's conduct favoring Fanatics, Fanatics' valuation and market strength has since ballooned. Fanatics was valued at $6.2 billion in August 2020 after raising $350 million in a private funding round.  Fanatics raised $320 million in additional funding in May 2021, giving it a valuation of $12.8 billion.  In August 2021, Fanatics secured an additional $325 million and is now valued at $18 billion.[19]

69.     Fanatics has used its funding to expand upon its "vertical" commerce model whereby it operates at all levels of the market, acting as licensee, manufacturer, supplier, wholesaler, distributor, and retailer.  In December 2020, Fanatics purchased WinCraft, Inc. ("WinCraft"), a supplier to Casey's and licensee of NFL Licensed Hardgoods, including, but not limited to, flags, banners, wall art, pennants, decals, and lanyards.[20]  At the time of Fanatics' acquisition of WinCraft, it was estimated that WinCraft generated $100 million in annual revenue, employed over 500 staff, and held client relationships with all of North America's major leagues and teams.[21]

70.     As explained by Steve Davis, President of Fanatics International, "Fanatics has already successfully implemented this 'v-commerce' model across North America, where the company has

---

[18] *Michael Rubin Interview*, Forbes: Sports Money (Sep. 30, 2020), https://www.forbes.com/sites/mikeozanian/2020/09/30/michael-rubin-dishes-on-his--evolving-game-plan-for-fanatics-and-life/?sh=15b496cf1147 (hereinafter "*Sports Money Interview*").

[19] https://www.cnbc.com/2021/08/10/fanatics-valued-at-18-billion-with-new-investors-including-jay-z-.html (last visited October 7, 2021).

[20] https://www.sportspromedia.com/news/fanatics-wincraft-acquisition-hard-goods-non-apparel (last visited June 14, 2021).

[21] *Id.*

dramatically scaled up its design, manufacturing and distribution capabilities whilst securing an enviable portfolio of valuable sports licensing rights." [22]

71.     Due in part to its various acquisitions, including WinCraft, Fanatics' sales from its global e-commerce operations was recently reported to have been up 30% year-over-year and is expected to be over $3 billion in sales in 2021.[23]  Approximately one-third of Fanatics' sales is attributable to sales of NFL Licensed Products[24], 90% of which is transacted online.[25]  Thus, Fanatics' $1 billion in sales of NFL Licensed Products account for approximately one-third of the entire market for NFL Licensed Products, which is estimated to have generated $3 billion dollars in retail sales for 2020.

**C.     Online Retail is a Market Separate and Distinct from Brick-and-Mortar Retail.**

72.     Online retail constitutes a market distinct from brick-and-mortar retail.  As Rubin recognizes, e-commerce is the "most efficient vehicle."[26]

73.     Because of the unique features of online retail, NFL Licensed Sports Products purchased from brick-and-mortar retailers is not an adequate substitute for NFL Licensed Sports Products purchased from online retailers.  These unique features include the following:

a)     **Convenience**.  Online retail marketplaces give consumers the ability to purchase items and have those items shipped directly to their homes without needing to travel to a physical location; allow consumers to shop at any time rather than only when a physical store happens

---

[22] https://www.sportspromedia.com/analysis/how-fanatics-is-taking-its-v-commerce-model-global (last visited June 15, 2021) (emphasis added).

[23] https://www.cnbc.com/2021/03/24/fanatics-valuation-doubles-to-12point8-billion-after-new-funding-round.html (last visited October 7, 2021).

[24] https://www.forbes.com/sites/mikeozanian/2020/09/30/michael-rubin-dishes-on-his--evolving-game-plan-for-fanatics-and-life/?sh=76bf987c1147 (last visited October 7, 2021).

[25] *See* https://www.cnbc.com/video/2020/08/14/fanaticss-michael-rubin-on-the-companys-6-point-2-billion-valuation-and-growth-despite-pandemic.html (last visited October 7, 2021).

[26] *Fireside Chat with Michael Rubin: Disrupt SF 2018*, Tech Crunch (Sep. 7, 2018, 12:02 PM), https://techcrunch.com/video/fireside-chat-with-michael-rubin-fanatics-disrupt-sf-2018/.

to be open; and enable consumers to avoid the inconvenience and potential safety hazards associated with crowds.[27]

b)    **Selection**.  Online retail marketplaces give consumers access to a larger volume and variety of inventory.  As Rubin explains, "[t]he advent of the internet allowed this incredible availability of inventory to serve every fan for whatever team they want, whatever player they want, whatever gender they want, whatever color they want."[28]

c)    **Geographically unlimited**.  Online retail marketplaces make it possible for consumers to purchase NFL Licensed Sports Products from geographically distant Teams in addition to more local Teams and Teams with national followings.  As Rubin has publicly stated, online retail of NFL Licensed Sports Products has been successful in part because "we realized that there were so many fans that lived in different markets from the team that they were a fan of and they couldn't find that merchandise."[29]

d)    **Data Collection**.  Online retail marketplaces give retailers the ability to collect more and higher quality data regarding consumer behavior in order to more accurately anticipate fans' desires and have the correct product mix available.

e)    **Virtual Shelf Space**.  Online retail marketplaces allow sellers to offer a greater variety of merchandise without the expense of acquiring and maintaining the additional display space that would otherwise be needed at a physical retail location.

f)    **Agility**.  Online retail marketplaces help retailers make new products or products for which demand has unexpectedly increased available more quickly than is possible for brick-and-mortar stores.  For instance, if a player makes an impressive play in a nationally televised game, demand for products bearing that player's name often spikes; this demand can be more easily satisfied by retailers that do not have to acquire and display products in a brick-and-mortar store before they can sell them to satisfy the demand.

---

[27] This benefit of online retail has been amplified during the COVID-19 pandemic.

[28] NBC Sports Phila., *Sixers Partner Michael Rubin: Barkann's Big Guest*, Youtube (Dec. 18, 2019), https://www.youtube.com/watch?v=IQRzlcywjO4.

[29] *The Rich Eisen Show*, YouTube, (Sep. 18, 2019), https://www.youtube.com/watch?v=mPVPBItYVd4.

74.    For these and other reasons, there is an inelasticity of demand between products available for purchase online and those that could be purchased at brick-and-mortar stores.  As a result, prices available at brick-and-mortar stores do not meaningfully constrain the prices charged by online retailers.

75.    Retailers within the online market for NFL Licensed Sports Products look to other online retailers when determining what prices or other features are necessary in order to compete.

76.    Although online retail is typically considered to have lower barriers to entry than brick-and-mortar retail, the barriers are still significant and overlap with those facing brick-and-mortar retailers, including the following:

a)    New retailers' need to acquire NFL Licensed Sports Products to sell from the limited number of licensed manufacturers and their distributors;

b)    New retailers' need to construct a website and then to advertise through search engines and other means in order to generate traffic;

c)    Established retailers' ability to take advantage of economies of scale; and

d)    Consumer preference for retailers with whom the consumers are already familiar.

77.    To lower these barriers to entry, many online retailers use TPOMS rather than more traditional e-commerce platforms.  A more traditional e-commerce platform is a separate website for a single individual retailer that allows purchases of that retailer's products (e.g., www.dicksportinggoods.com) and is analogous to a brick-and-mortar store that sells one retailer's inventory exclusively (e.g., a Dick's Sporting Goods store).

78.    A TPOM, by contrast, is analogous to a farmers' market where a single location hosts multiple independent sellers, who often offer the same or very similar products and compete on the basis of price or quality.  In exchange for providing a platform for sales, a TPOM takes a commission from the third-party retailers' sales (and may charge other fees as well).  Familiar TPOMs include the Amazon Marketplace, eBay, and Walmart.com.

79.     Some websites, such as Amazon.com, include both traditional retail (where Amazon purchases products that it them resells to consumers) and a TPOM (where third parties sell products to consumers using Amazon's platform).

80.     TPOMs offer various advantages to third-party retailers.  They reduce transaction and start-up costs by allowing the seller to piggyback on the brand recognition and traffic of the marketplace site, thereby eliminating the need to design and to drive traffic to a separate e-commerce platform.  This advantage is particularly great for retailers that sell products that are identical or very similar to products sold by many other retailers.

81.     TPOMs also provide centralized payment processing for shoppers and third-party sellers, thereby providing shoppers with a sense of security when providing their financial information online and eliminating the need for third-party sellers to create and maintain a secure portal for internet purchases.  On most TPOMs, a buyer may select items from one or many different sellers but combine all of the items into a single purchase on the TPOM platform.

82.     For an additional fee, some TPOMs such as the Amazon Marketplace allow third-party sellers to store their products at the TPOM's warehouses from which the TPOM will ship the product to the customer.  For a smaller retailer, this benefit further reduces start-up costs and allows the retailer to take advantage of the lower cost of fulfillment services made possible by the TPOM's economies of scale.

83.     Because these features increase access to customers and reduce transaction costs, they are significant, particularly for smaller retailers and the companies that supply them.

84.     In effect, TPOMs reduce the cost of accessing the benefits of e-commerce, thereby making it easier for new retailers to enter the online retail market and smaller retailers to remain in that market.  As discussed herein, Defendants have conspired to protect their share of the online retail market by excluding competing distributors and retailers from TPOMs, thereby substantially increasing the cost of participating in the online retail market for NFL Licensed Sports Products.

**D.     Casey's and Others Have Been Excluded from Selling on Amazon's Platform**

85.     The trend in this market has been for all participants—licensees and non-licensee distributors and retailers (including, but not limited to, Casey's)—to sell NFL Licensed Products

directly to consumers through TPOM, the most important avenue being Amazon.  This has rendered these market participants as horizontally competing retailers on TPOM, especially Amazon, for NFL Licensed Products.  In fact, Amazon's TPOM serves as a sole source of income for many competitors who sell NFL Licensed Products to consumers.  Amazon's TPOM is the most important platform for small businesses, such as Casey's, to participate in the online retail market for NFL Licensed Products sales.

86.     In 2015, the NFLP announced it was implementing an Online Distribution Policy ("ODP") restricting NFL Licensed Product sales on TPOM, such as Amazon.com, by purportedly requiring licensees to arrange that any retailer on TPOM first be approved by NFLP, in order to ensure that such retailers "maintain control over, and responsibility for, their e-commerce transactional environment."  However, the ODP as written did not prohibit licensees and non-licensees from selling directly to Amazon.  In other words, the ODP as written allowed licensees and non-licensees to sell products directly to Amazon, but it prohibited licensees from selling to distributors or retailers that intended to sell on Amazon without receiving prior authorization to do so from the NFL.

87.     Casey's initially experienced little to no enforcement of the NFLP's ODP.  Meanwhile, Amazon was in the process of becoming the most important retail outlet for Casey's to reach consumers of NFL Licensed Products.  Indeed, licensees sold NFL Licensed Products to Casey's without referencing the ODP.

88.     It is a legitimate practice for non-licensee companies, such as Casey's, to purchase NFL Licensed Products from licensees and distribute those products to retailers or retail the products themselves.  The NFL's policies as written do not restrict the retailing of NFL Licensed Products to licensees.  But in practice, the NFL Defendants, Fanatics, and colluding licensees are effectuating a system that will limit online retailers.

89.     What made this practice even more egregious was the context and sequencing of when the ODP was raised.  Casey's and similarly situated companies legitimately bought NFL Licensed Products from licensees, without a mention at the time of the transactions to (i) the ODP, (ii) the purchasers being in privity of the ODP, and (iii) limitations of the lawful purchasers being able to retail the NFL Licensed Products on Amazon.com.

90.     Only after the legitimate purchases of these products from licensees did the licensees use the ODP as a weapon to disable Casey's and similarly situated companies from legitimately retailing NFL Licensed Products on Amazon.com.

91.     Only after the mid-2017 NFL equity investment of approximately $95 million into privately held Fanatics did enforcement of the ODP effectuate, with enforcement efforts carried out by licensees pressuring Casey's to remove NFL Licensed Products from TPOM or risk having its supply cut off.

92.     Fanatics recognized the problem that robust competition on Amazon posed to it.  It is in their role as retailers that Fanatics and the NFL Defendants are in competition with retailers that sell on TPOMs.  But therein lies the problem for Defendants—the presence of rivals selling the same or similar NFL Licensed Products on TPOMs.  According to Rubin, if everyone else is selling what you're selling on a TPOM, "it is going to get commoditized by Amazon and Alibaba."[30]  And as Rubin put it, if NFL Licensed Products were commonly available on Amazon, "there'd be no reason for [Fanatics] to be."[31]  In another interview, Rubin put an even finer point on it: "If your strategy is just to win on price [selling on a TPOM], you're eventually going to die."[32]

93.     Faced with the challenge of increased competition and recognizing the benefits of collusion, Defendants conspired to allocate the market for NFL Licensed Products on Amazon. Defendants unlawfully leveraged their market power over licensees to force those licensees to boycott smaller retailers who sold NFL Licensed Products through TPOMs.

94.     Defendants employed a carrot-and-stick approach to enlist licensees' cooperation. Defendants first threatened licensees with the loss of both their licenses to produce NFL Licensed Sports Products and the loss of Fanatics' business if they did not comply.  Then, as the carrot, Fanatics promised that it would increase its purchases from those licensees who played ball, in order to make up for the now-forbidden sales to smaller retailers.  And, in at least one case, Fanatics outright

---

[30] *Kynetic CEO: Here's How a $12 Billion Company Competes Against Amazon*, CNBC: Squawk Box (Nov. 27, 2017), https://www.cnbc.com/video/2017/11/27/kynetic-ceo-heres-how-a-2-billion-company-competes-against-amazon.html.

[31] *Fireside Chat with Michael Rubin: Disrupt SF 2018*, *supra*.

[32] Recode, *Full Interview, Adam Silver, NBA Commissioner and Michael Rubin, Exec Chairman of Fanatics*, Youtube (Sep. 13, 2017), https://www.youtube.com/watch?v=TQx65nkEDPI.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF ANTITRUST AND UNFAIR COMPETITION LAWS

purchased the business of a large cooperating licensee and then used that entity to further enforce the scheme.

95. The licensees indeed responded to the requests from the NFL—and even by Fanatics, a horizontally competing licensee—by enforcing the ODP to exclude retailers of NFL Licensed Products on Amazon. Indeed, each individual licensee's enforcement of the ODP to boycott their clients—the non-licensee distributors and retailers—from retailing on Amazon.com would have been economically disadvantageous to them because they would have lost sales and market share to horizontally competing licensees who would sell to those same clients. But this economic disadvantage would have been mooted if the licensees had an understanding that other licensees would also enforce the ODP to boycott non-licensee distributors and retailers from selling NFL Licensed Products on Amazon, and thus each individual licensee would not have to worry about their former clients being poached by other licensees. A former NFL licensee of hard goods and a supplier of Casey's stated that in late February 2021, it was contacted by the NFLP and was told that the NFLP would not renew its license because the NFLP said that it was partnering with Fanatics and that Fanatics would fill the NFLP's hardgoods needs. The former licensee also said that it had an understanding that other licensees were going to enforce the NFLP's ODP against non-licensee companies that ultimately retailed on Amazon.com. They would receive letters from the NFLP saying that its products were being sold on third-party markets places by non-licensees.

96. Licensees that enforced the ODP—without an understanding or assurances from the Defendants that other licensees would enforce the ODP—would be put at a competitive disadvantage because they would lose sales and market share to licensees who did not enforce the ODP. The licensees who did not enforce the ODP would continue selling to non-licensed purchasers who sold NFL Licensed Products on TPOM, especially Amazon. This dynamic demonstrates why it was important for the Defendants to have created a collusive system where licensees understood that other licensees were also agreeing to enforce the ODP.

97. The licensees indeed responded to the requests from the NFL—and even from a horizontally competing licensee, Fanatics—by enforcing the ODP to exclude retailers of NFL Licensed Products on TPOM, especially Amazon.

---

21

98.     The ODP explicitly carved out Fanatics and related websites that Fanatics controls, specifying them as approved to sell the restricted NFL Licensed Products, including the following websites:

    a.      NFLShop.com

    b.      NFL Member Club stores on the Member Club's official website

    c.      NFLPA.com

    d.      Fanatics.com

    e.      Fansedge.com

    f.      Profootballhof.com

    g.      Nike.com

    h.      NewEraCap.com

In addition to the inclusion of fanatics.com on this exclusive list, Fanatics "powers" or operates NFLShop.com and fansedge.com, has struck various exclusive licensing deals with Nike, and powers the websites of a majority (but not all) of the NFL Teams (*i.e.*, NFL "Member Club" official websites).

99.     In line with this expansion of ODP-enforcement efforts following the NFL's investment in Fanatics, Casey's experienced the following:

    a.      In a letter dated May 20, 2019, from Duck House to Casey's, Duck House demanded that Casey's remove NFL Licensed Products from TPOM pursuant to the NFLP's purported policies.

    b.      In an email on August 1, 2020, Casey's supplier and licensee ForeverCollectibles, LLC, d/b/a FOCO ("FOCO") FOCO demanded Casey's remove NFL Licensed Products from Amazon, even though FOCO itself sold NFL Licensed Products on Amazon.

    c.      In an email on August 5, 2020, to Casey's from Little Earth on the NFL's behalf, Little Earth asked for lists of confidential information about Casey's transacting and customers.

    d.      During an October 8, 2020, call from Casey's supplier and wholesaler/licensee, WinCraft, ***WinCraft said that it was acting on Fanatics' behalf*** and requiring

that Casey's remove products from Amazon that Casey's lawfully bought from WinCraft.  This took place before Fanatics' acquisition of WinCraft.  And at that time, WinCraft and Fanatics were horizontal competitors.

e.  During a call on January 25, 2021, after Fanatics' acquisition of WinCraft in December 2020, a high-level representative at WinCraft told Casey's that (i) Fanatics is forcing WinCraft to impose the TPOM policy, (ii) he knew that TPOMs are the industry's future, (iii) he knew that enforcing the TPOM policy would drive Casey's out of business, but (iv) Casey's must reduce its listings on Amazon.  ***According to the high-level representative at WinCraft, Fanatics wanted to dominate the industry at all costs by putting pressure on WinCraft to eliminate Fanatics' horizontal competitors.***  He also sent Casey's a TPOM compliance tracker of several companies showing how other company's sales of WinCraft products on TPOM had been reduced.  This call demarked a significant change in the relationship between Casey's and WinCraft, as Casey's had received WinCraft's "Distributor of the Year" award for two consecutive years prior to this demand.  Indeed, in an email on January 26, 2021, the high-level representative at WinCraft stated: "Thanks for your time yesterday and great accomplishments in 2020.  Your company has been a great customer of WinCraft for many years.  We appreciate your business."

f.  In an email in February 2021, Casey's supplier and licensee Siskiyou Sports demanded Casey's remove NFL Licensed Products from Amazon because of the ODP.

100.  In emails during February and March 2021, a second high-level representative at WinCraft demanded that Casey's remove all WinCraft products from Amazon, including those listed by one of Casey's customers.  The high-level representative at WinCraft additionally threatened to withhold shipments if the demand was not met.  These demands were made due to Casey's customers' sales of NFL Licensed Products on TPOM.  In particular, the high-level representative at WinCraft emailed Casey's Kelly Vande Mheen on March 16, 2021, demanding that Casey's take down from

Amazon all products that WinCraft sold to Casey's.

101.    On or about March 18, 2021, the NFL and Amazon announced an agreement where the NFL granted the "all-digital" rights associated with "Thursday Night Football" to Amazon, originally scheduled to begin with the 2023 season, but which was subsequently moved up to commence with the 2022 season.[33]

102.    On March 24, 2021, Amazon notified Casey's that it must become an NFL-authorized seller to continue selling NFL Licensed Products on Amazon due to a "new agreement with the NFL." Casey's was provided until May 23, 2021, to remove all items that would be in violation of the new policy.  Soon after, NFLP imposed and implemented new restrictions on which entities could sell NFL Licensed Products on Amazon's TPOM, as manifested in the NFLP's Approved Marketplace Retailer Application ("AMRA").  The AMRA provides in part:

> NFLP will authorize its Licensees to sell their NFL licensed products to a limited number of approved quality retailers that will sell those NFL licensed products under an Amazon URL through the Amazon Marketplace (the "Approved Marketplace Retailers") through the 2021 NFL season and in accordance with all applicable NFL policies.

Under this NFLP policy (sometimes referred to herein as the "TPOM Policy"), licensees are not allowed to sell NFL Licensed Products to retailers that intend to sell those products on the Amazon Marketplace, unless expressly granted permission to do so by the NFLP and at the NFLP's "sole discretion" as the Approved Marketplace Retailer Application states.[34]

103.    Although the NFLP is not obligated in any way to approve applicants, the terms of NFLP's AMRA require that applicants broadly release their rights in exchange for (merely) the

---

[33] *See* https://nflcommunications.com/Pages/NFL-COMPLETES-LONG-TERM-MEDIA-DISTRIBUTION-AGREEMENTS-PROVIDING-FANS-GREATER-ACCESS-TO-NFL-GAMES-THAN-EVER-BEFORE.aspx (last visited August 23, 2021).  In May of 2021, the parties agreed to accelerate the timing to begin Amazon's distribution of *Thursday Night Football* "across hundreds of compatible digital devices," beginning with the 2022 season.  *See* https://nflcommunications.com/Pages/AMAZON-PRIME-VIDEO-TO-BECOME-THE-EXCLUSIVE-HOME-OF-THURSDAY-NIGHT-FOOTBALL-BEGINNING-WITH-THE-2022-SEASON.aspx (last visited August 23, 2021).

[34] The window within which to apply to become an "Approved Marketplace Retailer" closed on April 14, 2021, the web portal to which was located at https://marketplace.nfl.net/.

opportunity to be considered as an "Approved Marketplace Retailer."  Specifically, the AMRA provided:

> Company hereby irrevocably releases NFLP, NFL Ventures, L.P. and its direct and indirect subsidiaries, the National Football League and its member professional football clubs ("Member Clubs"), and each of their respective affiliates, officers, directors, agents, subsidiaries, shareholders, representatives and employees (collectively, the "NFL Entities") from any claims whatsoever arising out of, or related to, this Application, the Application process, and/or any decision to approve or disapprove Company as an Approved Marketplace Retailer.

104.    Casey's opted not to release its rights in exchange for the mere possibility of becoming an "Approved Marketplace Retailer" and so is not an "Approved Marketplace Retailer."[35]

105.    The day after Amazon notified Casey's that it would no longer be allowed to continue selling NFL Licensed Products, unless it became an "Approved Marketplace Retailer," on March 25, 2021, news articles reported that NFLP and Amazon had entered into an agreement where the NFL would begin selling NFL Licensed Products on Amazon with Fanatics operating the NFL's Amazon "storefront" (herein referred to as the "Merchandise Agreement").  The publication *Promo Marketing* reported that "Fanatics, which operates the NFL's online store, created an NFL Shop 'storefront' on the Amazon platform, which marks the first time Fanatics will sell its products on Amazon."[36]

106.    The Merchandise Agreement is believed to permit the NFLP to limit the number of NFL Licensed Products retailers allowed to sell on the Amazon marketplace.

107.    The NFLP-Amazon Merchandise Agreement has been described as "a move that could transform the multibillion-dollar market for fan gear ***because it opened Amazon's platform up to Fanatics—a former competitor of Amazon's in the e-commerce retail market of licensed sporting goods, including NFL Licensed Products.***[37]  To be sure, the Merchandise Agreement is a

---

[35] Casey's has recently learned, as further discussed herein, that even those approved to engage in Amazon TPOM sales have had their NFL Licensed Product supplies limited or placed at risk due to agreements entered into between one or more licensees and Defendant Fanatics.

[36] *See* https://magazine.promomarketing.com/article/amazon-will-start-selling-licensed-nfl-merchandise-via-fanatics/ (last visited August 23, 2021).  *See also* https://sgbonline.com/fanatics-nfl-launching-amazon-storefront/ (last visited August 23, 2021).

[37] https://www.sportico.com/leagues/football/2021/amazon-nfl-shop-1234625615/ (last visited August 24, 2021).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF ANTITRUST AND UNFAIR COMPETITION LAWS

convergence of the world's richest sports league (the NFL), the world's largest retailer (Amazon), and the world's largest seller of licensed fan gear (Fanatics).  Fanatics appears to have a critical role within the Merchandise Agreement insofar as Fanatics now operates the NFL's online store and now operates the NFL Shop "storefront" on Amazon's website, its first time selling on Amazon's platform.

108.    Commenting on both the streaming rights deal and the NFL's decision to sell licensed products on Amazon, *Sportico* observed on March 24, 2021, that "[l]ast week Amazon signed a new streaming deal with the NFL worth $1.32 billion per year.  Though these two deals are separate, they are strategically aligned."[38]  *Engadget* reported on March 25, 2021, that "Amazon is partnering with the NFL to plug a gap in its online store by making the vast majority of the league's fan gear available to purchase."[39]  *Engadget* then observed that "[i]t's hard to ignore the timing of the tie-up, which arrives on the heels of Amazon's exclusive grab of *Thursday Night Football* rights for its Prime Video service."[40]  The sports reporting and business consultancy, *Sportcal*, reported on March 25, 2021, that the NFL-Amazon "deal also incorporates Fanatics, the US online sportswear and merchandise retailer which has a long-term deal with the NFL."[41]  Similarly, *Sports Pro Media* reported on March 25, 2021, Fanatics' perspective on its involvement with the NFL-Amazon merchandise-related agreement: "a Fanatics spokesperson said:  'As part of the National Football League and Amazon's collaboration to expand the assortment of officially licensed NFL products, Fanatics will be opening an NFL storefront on Amazon in the near future and, along with other authorized sellers, is now enhancing the fan shopping experience through an increased selection of officially licensed NFL products.'"[42]

109.    Soon after Amazon informed Casey's that they would need to become an "Approved Marketplace Retailer" in order to continue selling on Amazon's TPOM and after the reporting of the

---

[38] *See* https://www.sportico.com/leagues/football/2021/amazon-nfl-shop-1234625615/ (last visited August 23, 2021).

[39] *See* https://www.engadget.com/amazon-official-nfl-merch-thursday-night-football-124004019.html (last visited August 23, 2021).

[40] *Id.*

[41] *See* https://www.sportcal.com/News/FeaturedNews/136088 (last visited August 23, 2021).

[42] *See* https://www.sportspromedia.com/news/nfl-amazon-merchandise-ecommerce-streaming-rights (last visited August 26, 2021).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF ANTITRUST AND UNFAIR COMPETITION LAWS

Merchandise Agreement, the following took place:

    a.    On May 20, 2021, a representative of Casey's reached out to a representative of Logo Brands indicating that Casey's had previously received an email from Logo Brands requesting that Casey's "take all products off of Amazon because of . . . 'contractual agreements,'" and asking Logo Brands to "shed some light of who these agreements are with."  In response, on May 24, 2021, wholesaler/supplier Logo Brands sent an email to Casey's demanding that Casey's remove products it had listed on Amazon due to a "new" "contractual agreement" ***Logo Brands "just signed with Fanatics*** which prevents 3rd part[ies] from selling Logo Brands products on Amazon."

    b.    On May 24, 2021, Amazon began removing Casey's inventory from Amazon's TPOM, with the removal of over 3,460 of Casey's items listed for sale between May 24, 2021, and June 2, 2021.

    c.    On May 24, 2021, one of Casey's customers, and a TPOM retailer, contacted Casey's after being removed from Amazon due to lack of "authorization" to sell the products.

    d.    On June 3, 2021, Casey's received a demand from supplier and licensee Logo Brands for Casey's to remove all of its listings on Amazon ***due to an "agreement" signed between Logo Brands and Fanatics***.  The agreement that Logo Brands made with Fanatics apparently directed Logo Brands, which also owns Boelter Brands, not to sell products on Amazon or allow any of their customers to sell on Amazon.  A high–ranking official at Logo Brands told Casey's Vande Mheen that the official had told the owners of Logo Brands a statement to the effect of "***do you realize that we are making a deal with the devil?***"  (Emphasis added.)

    e.    On June 18, 2021, a high–ranking representative at WinCraft emailed Casey's to inform them that another customer of Casey's was not allowed to purchase NFL Licensed Products, despite its status as an "Approved Marketplace

Retailer" allowed to sell on Amazon.  Specifically, the high–ranking representative at WinCraft wrote: "We have confirmed although Casey's customer has authorization from the NFL to sell on Amazon, we (WinCraft) are not to sell any NFL merchandise to them unless authorized and it aligns with our strategy."[43]  That same day, Casey's received a telephone call from the high level representative at WinCraft, confirming that WinCraft would not sell to this customer, even though the customer was an Approved Marketplace Retailer.

f.   On or around June 24, 2021, at the 2021 College Baseball World Series in Omaha, Nebraska, Casey's Mr. Vande Mheen met with a high-level representative at WinCraft.  ***The high-level representative at WinCraft told Mr. Vande Mheen that even if Casey's applied and was accepted as an Approved Marketplace Retailer of NFL-licensed products, WinCraft would still not sell any such products to Casey's, because Fanatics would have deemed that to have been against its business goals.***

g.   On September 21, 2021, that same customer—an Approved Marketplace Retailer of NFL-licensed products—received an email from a sales representative of Logo Brands (that had acquired Boelter Drinkware in 2021), stating that the NFL notified Logo Brands that this customer of Casey's was selling NFL Licensed Products (Boelter Drinkware products) on Amazon and must remove them from Amazon's TPOM, despite the fact that Casey's customer was purportedly approved by the NFL to sell on Amazon.

h.   Then, on September 22, 2021, that same customer emailed a representative of Casey's, informing the Casey's representative that it had received an email from Logo Brands asking it to stop selling items on Amazon.  Based on this request, this customer asked Casey's "to cancel the PO that I have placed with" Casey's.

---

[43] In addition to Casey's customer, the high level representative at WinCraft informed Casey's Mr. Vande Mheen that she knew of only two accounts that were approved to sell NFL Licensed Products on Amazon: (1) State Street (dba College Flags and Banners) and (2) Team Effort, which is an entity owned by WinCraft (which, in turn, was purchased by Fanatics in December 2020).

i.    On September 23, 2021, Casey's Vande Mheen emailed a high–ranking representative of Logo Brands to inquire about this demand, as Casey's customer was apparently an Approved Marketplace Retailer.  Later that day, the high-ranking representative of Logo Brands replied that he would consider this and assumed that Mr. Vande Mheen was referring to that specific Casey's customer (which reflects how few Approved Marketplace Retailers there are). Then, on September 24, 2021, the high-ranking representative of Logo Brands emailed Casey's Vande Mheen, stating:  "We are not allowed any 3rd parties (except Fanatics) to ship NFL products to Amazon.  This has nothing to do with [Casey's customer's] agreement with the NFL.  The Logo Brands agreement with Fanatics is why he can't sell this.  Please don't sell this guy anymore NFL products for him to sell Amazon."  This reflects that horizontally competing licensees, Fanatics and Logo Brands, have entered into an agreement to boycott retailers that compete with Fanatics and Logo Brands.

j.    Around September 27, 2021, a Logo Brands high-ranking executive had a call with Casey's Vande Mheen.  This high-ranking executive said that he gets a call from a vice president at Fanatics, which competes horizontally with Logo Brands as a licensee, once every few weeks.  The Fanatics vice president advised the Logo Brands high-ranking executive about which companies were selling on Amazon.com, which was against the agreement that Fanatics made with Logo Brands; according to the Logo Brands' high-ranking executive, no one was allowed to sell on or even to Amazon.com.  Casey's Vande Mheen asked what would have occurred if Casey's applied and was granted permission under the AMRA to have been an "Approved Marketplace Retailer."  The Logo Brands high-ranking executive stated that it would not have mattered because of Logo Brands' agreement with Fanatics, which are both horizontally competing licensees, under which Casey's would not have been able to sell its products on or even to Amazon.com—it is noteworthy that even under the ODP language,

Casey's would have been permitted to sell products to Amazon.com.  Casey's Vande Mheen asked the Logo Brands high-ranking executive about the legality of the agreement between Logo Brands and Fanatics.  In essence, the Logo Brands high-ranking executive stated that the agreement was known to have been problematic but that people realized how much wealth Fanatics and Rubin had, and thus nobody wanted to contest them.

k.    On September 29, 2021, as described in an email to Casey's Vande Mheen, this same customer spoke to a representative of Logo Brands and confirmed that Logo Brands has an exclusive deal with an Amazon approved seller and that Logo Brands requested that this Casey's customer "stock-down on" items then listed on Amazon's TPOM.

l.    Starting on November 5, 2021, a high-ranking executive at WinCraft emailed Casey's Vande Mheen, showing data that WinCraft has been monitoring about the listings on Amazon.com by an "Approved Marketplace Retailer" under the AMRA, and demanding that Casey's Vande Mheen force the "Approved Marketplace Retailer" to take down the products from Amazon.com.  Casey's Vande Mheen emailed a response that day, noting that its client was indeed an "Approved Marketplace Retailer" on Amazon.com under the AMRA and that Casey's reaching out to its client would put a strain on Casey's business relationship with the client.  And Casey's Vande Mheen asked WinCraft's high-ranking executive if WinCraft could forward a written policy that supported WinCraft's demand.  On November 7, 2021, WinCraft's high-ranking executive responded to Casey's Vande Mheen's email, stating the following, in part: "I understand the challenge and will always provide support within our policies.  At this time I don't have a specific document to [send the company] I am sure you understand why 3rd party selling would be important."  Throughout the rest of November 2021, the WinCraft high-ranking executive has been continuing to reach out to Casey's to demand reporting and compliance.

110.     In addition to the allegations above concerning correspondence demonstrating collusion here among horizontal competitors in the licensee and online retail segments, ***Casey's has been shown a written agreement that appears to be between Fanatics and its horizontally competing licensees to group boycott entities, such as Casey's, from competing with Fanatics and its colluding licensees in selling products on or to Amazon.***

111.     Defendants established and operated a mechanism to police and enforce the conspiracy through compliance trackers of the number of products and sellers who had been removed and/or boycotted from selling NFL Licensed Sports Products on TPOMs.  Those trackers were shared between Defendants in an effort to enforce the conspiracy with maximum efficiency.  Fanatics is the key driver and enforcer of the conspiracy, using high-pressure, strong-arm tactics to encourage licensees to help eliminate Fanatics' competitors from TPOMs.  Fanatics and its agents created reports that it sent to licensees showing the names of sellers and products offered for sale on TPOMs and threatened the licensees with consequences if the reports did not show progress in lowering the number of competing retailers and products offerings.

112.     Casey's own sales data demonstrate firsthand the importance of selling through Amazon's TPOM and show the damaging impact of the enforcement of the TPOM Policy.  For example, Casey's Amazon TPOM sales of NFL Licensed Products continued to increase, almost tripling from 2016 to 2020.  However, along with the March 2021 announcement of the *Thursday Night Football* "Streaming Rights Deal," the reporting of the "Merchandise Agreement," and the subsequent step-up in the enforcement of the TPOM Policy through Fanatics' influence and control over others, as of September 30, 2021, Casey's Amazon TPOM sales of NFL Licensed Products suddenly plummeted.  As all of Casey's NFL Licensed Products were de-listed by Amazon by September 30, 2021, Casey's has sold few, if any, NFL Licensed Products through Amazon's TPOM since that date.[44]  As a result of the Merchandise Agreement, Fanatics has effectively commandeered

---

[44]  Exacerbating Plaintiff's injury, the timing of the de-listing has resulted in denying Casey's the benefit of sales made during the important fourth quarter of 2021, which includes both holiday-related sales and the heart of the 2021-2022 regular NFL season.  *See* https://nflcommunications.com/Pages/NFL-Season-To-Feature-17-Regular-Season-Games-Per-Team.aspx (last visited October 6, 2021) (indicating that the regular season extends from September 9, 2021, to January 9, 2022).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF ANTITRUST AND UNFAIR COMPETITION LAWS

the e-commerce market for NFL Licensed Products to and for itself, while e-commerce retailers such as Casey's are excluded from their previously held positions as competitors in the NFL Licensed Products market on Amazon's platform.

E.    **The NFLP's Policy Prohibiting Retailers from Selling NFL Licensed Products on Amazon's TPOM Together with the Merchandise Agreement Violate The Antitrust Laws And Harm Competition**

113.    Through both its ODP and its AMRA, the NFLP restricts which entities are permitted to sell on Amazon's TPOM, thus reducing the number of entities on Amazon's platform that compete in the market for retail sales of NFL Licensed Products.  It is important to emphasize that both the AMRA and the ODP are designed to allow the NFLP to reach downwards to attempt to restrict the conduct of retailers – including those that lack privity with the NFLP.  As the AMRA indicates:

> NFL Properties LLC ("NFLP") obligates its consumer products licensees ("Licensees") to ensure the retailers that sell such Licensee's NFL licensed products via e-commerce maintain control over, and responsibility for, the e-commerce transactional environment, and refrain from selling their NFL licensed products under a third-party URL, without the prior written approval of NFLP.

In other words, through the AMRA, the NFLP leverages its license-renewal and other powers over its licensees in order to have its licensees effect control over those "retailers" to which its licensees sell and with which the NFLP has no direct contractual relationship.  Through this power to reach downwards via its licensees to control those with which it has no direct relationship, the NFLP regulates and restricts who can sell NFL Licensed Products on Amazon's TPOM and other third-party marketplaces.

114.    The AMRA states that even if approved, each "Approved Marketplace Retailer will be required to enter into a separate agreement with NFLP setting forth the terms and conditions pursuant to which NFLP will continue to designate such retailer as an Approved Marketplace Retailer."

115.    Similarly, the ODP obligates the NFLP's licensees to restrict the conduct of downstream retailers with which the NFLP lacks privity: "This Online Distribution Policy applies to all retailers of Licensed Products, and it is the express obligation of all licensees to ensure that its retailers comply with the terms of the policy."  Under an implied threat of non-renewal and other

powers over licensees, the NFLP uses the ODP to have its licensees regulate and restrict the conduct

of downstream retailers on the NFLP's behalf.  Under its "Website Branding" section, the ODP further

requires that:

> Licensees shall ensure that, without prior approval of NFLP, any retailer approved by
> NFLP to sell such Licensee's Gameday Product/Practicewear Apparel online (i) shall
> only sell such products via an e-commerce website that (a) is owned by such retailer,
> (b) is not co-branded with any third-party, and (c) displays primary and secondary
> branding consistent with the e-commerce website URL, and (ii) shall not offer such
> products for sale via the website portal of a third party that is not otherwise authorized
> by NFLP to sell Gameday Product/Practicewear Apparel.

Under "Control of Transaction Experience," the ODP also requires:

> All Licensees (including Licensees of apparel, headwear and hardlines products) shall
> ensure that retailers that sell such Licensee's Licensed Products via their e-commerce
> site(s) . . . maintain control over, and responsibility for, their e-commerce transactional
> environment.  Such retailers are not authorized to sell Licensed Products under a third-
> party URL, including the URL of any third party Internet marketplace site (e.g.,
> buy.com, ebay.com, amazon.com), without the prior written approval of NFLP.

With respect to ODP enforcement, the NFLP requires:

> Licensees who become aware that retailers are selling their Licensed Products in a
> manner prohibited by this Online Distribution Policy shall immediately advise their
> NFL licensing manager of such activity.

Also:

> NFLP reserves the right to cause all Licensees to immediately cease shipments of
> Licensed Products to any retailers that sell Licensed Products in a manner prohibited by
> this Online Distribution Policy, and all Licensees shall comply with any such
> prohibition.

Specifying its power over Licensees, the ODP further indicates that:

> NFLP reserves the right to amend this Online Distribution Policy in any manner and at
> any time.  This includes prohibiting any Licensee from selling Licensed Products to any
> e-commerce retailer if NFLP determines that allowing sales by such e-commerce
> retailer would be detrimental to the NFL brand image (i.e., if the e-commerce site is
> selling Licensed Products in a manner that reflects poorly upon the NFL brand).

Further, under the ODP, approved marketplace retailers could not bid on search terms that were NFL

marks, whether it be on general Internet search engines or other forms of targeted advertising.

116.    In addition, Defendant Fanatics engaged in anticompetitive conduct by entering into

separate agreements with WinCraft (before it was acquired by Fanatics) and with Logo Brands, which interfered with, restricted, or hindered the ability of TPOM retailers like one of Casey's customers to obtain supply, despite the fact that this customer was an Approved Marketplace Retailer (but who had likely signed away its legal rights against NFLP).  This anticompetitive conduct is demonstrated by Logo Brands informing Casey's that even if Casey's was an Approved Marketplace Retailer, Logo Brands would not be allowed to sell products to Casey's because of the Logo Brand's agreement with Fanatics.

117.    Fanatics' ability to strangle the competition in online retailing of NFL Licensed Products is further demonstrated by brazen written agreements that it has in place with horizontally competing licensees and other types of companies that like Fanatics, either supplies or retails products online.  For example, Casey's has been shown a written agreement that appears to be between Fanatics and its horizontally competing licensees to group boycott entities, such as Casey's, from competing with Fanatics and its colluding licensees in selling products on or to Amazon.

118.    Another example is a written minimum-advertised-prices policy ("MAP Policy") that appears to be enforced by Fanatics against its horizontal competitors, whether they be licensees that horizontally compete with Fanatics or retailers that horizontally compete with Fanatics, that in essence forbids them from advertising lower prices than Fanatics—virtually all types of advertising in any forum, whether it be print, outdoor billboards/signage, broadcast, direct (paper) advertising, email and web advertising, internet advertising, or any type of web advertising.  This MAP Policy is not a suggestion: it has byzantine punishments for violators, such as suspension from purchasing Fanatics products indefinitely.

119.    By reducing the number of competing entities on Amazon's TPOM, prices for NFL Licensed Products are artificially increased.  In addition, product quality, service quality, and product selection are diminished, all reducing the quality of the customer experience.

120.    NFLP's restriction on selling on Amazon's TPOM does not impact Fanatics.  Rather, Fanatics' market power is greatly expanded by allowing it to increase its already dominant role in the market for NFL Licensed Products sold online—market power that Fanatics previously held by "powering" the NFL's various websites, including the websites for most of the NFL's thirty-two

member Teams, in addition to its own website (Fanatics.com).  Fanatics thus has become the exclusive seller of NFL Licensed Products on Amazon's marketplace, to the detriment of former competitors such as Casey's who once sold a substantial amount of NFL Licensed Products on Amazon's platform prior to being foreclosed from doing so by the NFLP.

121.    The anticompetitive conduct described herein has caused or is likely to cause consumers to pay higher prices for NFL Licensed Products and interference with the particular NFL Licensed Products that Plaintiff and others are able to sell.  Further, this anticompetitive conduct discourages new entrants into the market.

122.    If competing retailers are hindered, restricted, or prohibited from selling NFL Licensed Products on Amazon's TPOM, end-user customers will likely use the NFL's Amazon TPOM "storefront" or otherwise buy from the NFL, its member Teams, or Fanatics' other online retail Internet properties, where the NFL and Amazon can charge more for the products and generate even greater profits.

123.    Further limiting an e-commerce retailer's ability to compete, the NFLP places restrictions on entities looking to sell NFL Licensed Products by preventing them from using any trademarks associated with the NFL or its member teams in connection with paid search on Internet search engines (e.g., Google, Yahoo!).  For example, the NFL recently discovered that one of Casey's customers purchased the phrase "Philadelphia Eagles" as part of its purchased search terms in violation of the NFLP's ODP.

124.    On April 14, 2021, a Licensing Director at the NFL emailed a high level representative of Evergreen the "PLA Violation" letter stating that, in part, "without authorization from NFL Properties LLC ("NFLP"), Carroll's Cove ("Retailer") has been bidding on, or purchasing, NFL trademarks on Internet search engines in connection with product listing advertisements ("PLAs") for NFL licensed products manufactured by and/or purchased from licensee for sale via Retailer's ecommerce site."  (Emphasis in original.)  Enclosed with the "PLA Violation" letter was a version of the NFL's ODP, which stated that the "NFLP will review the Online Distribution Policy on no less than an annual basis and it is subject to change at any time, in NFLP's sole discretion, with or without prior notice."  The ODP included an anti-competitive clause forcing NFL Licensed Properties

licensees and retailers—who had no privity to this ODP—to agree not to compete on purchasing and using search terms, stating the following, in relevant part:

> Unless otherwise expressly approved in advance in writing by NFLP, retailers authorized under this policy to sell Licensed Products (including, but not limited to, Gameday Product/Practicewear Apparel) online are <u>not</u> authorized to use NFL Marks (as defined in the Licensee's license agreement from NFLP) on, or in connection with, their e-commerce sites (other than to the extent such NFL Marks are visible on Licensed Products displayed for sale on such e-commerce sites), including, but not limited to, (a) by bidding on or purchasing "NFLShop", any variation of such term, or any other NFL Marks (e.g., Philadelphia Eagles or Philadelphia Eagles [jersey]) in connection with (i) paid search on Internet search engines (e.g., Google, Yahoo!) or (ii) other forms of targeted advertising (e.g., Product Listing Ads or targeted advertising via social media), or (b) using NFL Marks to indicate that their e-commerce store sells NFL and/or Member Club Licensed Products.

**F.     No Procompetitive Justifications Excuse Defendants' Collusive Conduct.**

125.    Because Defendants' collusion to impose a horizontal boycott of retailers competing with Fanatics and the NFL Defendants is *per se* illegal, any procompetitive justifications for their conduct are irrelevant.

126.    Nevertheless, there are no legitimate procompetitive justifications for the anticompetitive conduct alleged in this Complaint or for any individual aspect of Defendants' conspiracy.  But even if there were, there are substantially less restrictive means of achieving those purported procompetitive effects.  To the extent that Defendants' conduct has any cognizable procompetitive effects, they are far outweighed by the harm to competition and consumer welfare described in this Complaint.

127.    The AMRA's purported objective is to "improve the selection of NFL licensed products on the Amazon.com marketplace (the "Marketplace") and to protect the NFL brand by ensuring a premium presentation of NFL licensed products and a high level of customer service to purchasers of NFL licensed products."

128.    Evidence of diminishing product quality and poor customer service directly attributable to Fanatics is abundant.  For example, the Better Business Bureau lists 489 complaints in the past three

years for "Fanatics Retail Group" with an average Customer Review Rating of 3.27/5 stars[45]; and 269 complaints in the past three years for "Fanatics, Inc." with an average Customer Review Rating of 1.2/5 stars.[46]  Common complaints include problems with customer service, shipping delays, and product defects.[47]  Improved competition in the market would naturally diminish the frequency of such complaints because competing market participants would compete to improve product quality, service quality, and customer satisfaction.

129.    The NFLP's purported objectives as stated in the AMRA are nothing more than pretext and could be accomplished by substantially less restrictive means and in fact likely will not be accomplished by restricting entities such as Casey's from selling on Amazon's TPOM.  For example, Amazon's Founder and CEO Jeff Bezos testified before the House Judiciary Committee that third-party sellers on Amazon's platform increase product selection and improve customer satisfaction:

> But we committed to the idea that over the long term [allowing third-party sales] would increase selection for customers, and that more satisfied customers would be great for both third-party sellers and for Amazon.  And that's what happened.  Within a year of adding those sellers, third-party sales accounted for 5% of unit sales, and it quickly became clear that customers loved the convenience of being able to shop for the best products and to see prices from different sellers all in the same store.  These small and medium-sized third-party businesses now add significantly more product selection to Amazon's stores than Amazon's own retail operation.[48]

In Bezos' words, and in contradiction of the NFLP's TPOM Policy, after the introduction of third-party sellers "the whole pie did grow, third-party sellers did very well and are growing fast, and that has been great for customers and for Amazon.[49]

130.    In addition, the NFLP's TPOM Policy does not reduce the presence of counterfeit

---

[45] https://www.bbb.org/us/fl/jacksonville/profile/sporting-goods-retail/fanatics-retail-group-0403-29000877/complaints (last visited June 22, 2021).

[46] https://www.bbb.org/us/fl/jacksonville/profile/sporting-goods-retail/fanatics-inc-0403-235965780/customer-reviews (last visited June 22, 2021).

[47] *Id.*

[48] https://www.congress.gov/116/meeting/house/110883/witnesses/HHRG-116-JU05-Wstate-BezosJ-20200729.pdf (last visited October 7, 2021).

[49] *Id.*

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF ANTITRUST AND UNFAIR COMPETITION LAWS

goods in a manner that is narrowly tailored to accomplish that goal. Rather than reducing the presence of counterfeit goods, Defendants' concerted action is targeted not at pirates, but, by definition, at those entities who are reselling officially licensed products sold by approved licensees. For example, Casey's does not sell counterfeit goods, has never been accused of selling counterfeit goods, and has no intention of selling counterfeit goods in the future. The NFLP decides who receives a license in the first instance; subsequent transactions on TPOM do not invalidate the license.[50] Yet, Casey's and the class are prohibited from selling NFL Licensed Products on Amazon's TPOM. If the goal is to prevent the sale of counterfeit NFL Products, the NFLP's TPOM policy is overbroad.

## V. THE RELEVANT ANTITRUST MARKET & MARKET POWER

131.    The relevant product market is the Amazon-based third-party online retail market for Products bearing the Intellectual Property of the NFL or any NFL team.[51] The relevant geographic market is the United States of America.

132.    This market is limited to new products. The market for new NFL Licensed Sports Products is distinct from the market for vintage NFL Licensed Sports Products. Vintage NFL Licensed Sports Products are sold by different types of sellers through different outlets. For instance, vintage sports memorabilia, particularly if it is valuable or rare, is often sold through auctions or private sales rather than through retail outlets. Even sellers that sell both new and vintage NFL Licensed Sports Products will tend to display them separately in both brick-and-mortar or online stores rather than mixing the two types of products together. The pricing structure also tends to differ; prices for products associated with current athletes on a team tend not to vary substantially with the identity of the athlete, while the price of vintage products heavily depends on the rarity and age of the product, as well as on the popularity of the player appearing on the product (e.g., a signed Joe Montana football would typically sell for much more than a football signed by a lesser-known player). Consumers also

---

[50] The U.S. Supreme Court applied the first sale doctrine to trademark law in *Prestonettes, Inc. v. Coty*, 264 U.S. 359 (1924).

[51] This definition is adopted from *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1105, 1106 (N.D. Cal. 2013), where the Northern District of California found the following market definition in a class action against the NFL and related entities sufficient overcome dismissal: "The United States retail market for apparel bearing the Intellectual Property of any NFL team."

treat the two types of products quite differently, indicating that they are not exchangeable for one another.  For instance, a fan might purchase a new jersey bearing the name of a favorite player to wear to a game or a victory parade but would be unlikely to wear a costly vintage jersey.

### A.   NFLP's Monopoly or Market Power

133.   According to the "Licensing Pre-Qualification Terms and Conditions Agreement," within the United States, the "NFLP serves as the representative of the National Football League and its member professional football clubs for the licensing of their trademarks and logos . . . ."[52]  Thus, the NFLP is the entity responsible for licensing the NFL and its member Teams' intellectual property.  Although non-exclusive licenses were previously the norm, in December 2000, the NFL member Teams voted to authorize the NFLP to grant exclusive licenses.[53]

134.   As alleged herein, NFLP controls the merchandising and licensing of NFL Licensed Products.  It is not legally possible for wholesalers/licensees to sell NFL Licensed Products without first obtaining a license to use the Intellectual Property from the NFLP or without first obtaining a license to use the Intellectual Property from any of the NFL's member Teams at issue.  The NFLP has monopoly or market power over the upstream United States market for the licensing of the NFL's and its member Teams' Intellectual Property, including licensing fees and minimum guarantees.  For that reason, the NFLP maintains all or substantially all control over how NFL Licensed Products reach consumers and has market power as a result.[54]

135.   NFLP's monopoly power in the relevant product market is also demonstrated by its ability to control the entities that may sell NFL Licensed Products as shown by the AMRA that is challenged in this case.[55]  By controlling who may sell NFL Licensed Products, the NFLP's control of

---

[52] *See* https://www.nfl.info/NFLConsProd/Welcom/cpAgreement.htm (last visited June 14, 2021).

[53] *See American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 187 (2010).

[54] As Defendant NFLP is a privately held entity and has not released to the public market share-related information in any materially significant or meaningfully helpful way, Defendant NFLP's market share information is not known with specificity to Plaintiff at this time.  However, discovery will likely shed light as to both Defendant NFLP's and Defendant Fanatics' respective market shares, as well as how Defendant NFLP's market share impacts others.

[55] The Ninth Circuit and federal district courts have repeatedly recognized that the nature and activities of the NFL make it appropriate for a separate market analysis (or sub-market analysis).  *See American*

NFL trademarks poses a barrier to entry to competition.  As discussed above, NFLP's control extends to regulating the conduct of its licensees, including by requiring them to monitor downstream product purchases and restricting downstream sales on Amazon's TPOM.

### B.  Amazon's Monopoly or Market Power

136.    The monopoly power of Amazon over the third-party marketplace was recently recognized by Congress in a House Judiciary Committee Staff Report and Recommendations ("Judiciary Report"), which concluded that Amazon has significant and durable power in the U.S. online retail market, with up to 50% of all online sales being controlled by Amazon.[56]  The report also concluded that as the dominant marketplace in the United States for online shopping, Amazon's market power is at its height in its dealings with third-party sellers.[57]  According to the Judiciary Report:

> The [Amazon] platform has monopoly power over many small- and medium-sized businesses that do not have a viable alternative to Amazon for reaching online consumers.  Amazon has 2.3 million active third-party sellers on its marketplace worldwide, and a recent survey estimates that about 37% of them—about 850,000 sellers—rely on Amazon as their sole source of income.[58]

---

*Needle, Inc. v. Louisiana New Orleans Saints*, No. 04-07806 (N.D. Ill. May 5, 2005), ECF No. 23, at 13 ("we do not see how, as a matter of law, a unique market cannot exist for the manufacture and distribution of merchandise carrying the NFL trademarks"); *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1105, 1106 (N.D. Cal. 2013) (adopting the relevant market reasoning of *American Needle* and recognizing that "the logos and trademarks of the NFL and NFL teams may very well be the products themselves that consumers seek to purchase"); *Los Angeles Memorial Coliseum Commission v. NFL*, 726 F.2d 1381, 1393 (9th Cir. 1984) (holding that NFL games constitute a market separate from other forms of entertainment, and noting that NFL considers its product unique, and that its fans are different from college football fans); *Sullivan v. National Football League,* 34 F.3d 1091, 1097 (1st Cir. 1994) ("it is well established that NFL clubs also compete with each other, both on and off the field, for things like fan support, players, coaches, ticket sales, local broadcast revenues, and *the sale of team paraphernalia*.") (emphasis added).

[56] Staff of S. Comm. On Antitrust, Commercial, and Admin. Law of the Comm. On the Judiciary, 116th Cong., Rep. on Investigation of Comp. in Digital Markets, p. 15.

[57] *Id*.

[58] *Id*.

---

The Judiciary Report also noted that "[a]s a result of Amazon's dominance, other businesses are frequently beholden to Amazon for their success."[59]

137.   Moreover, the Judiciary Report explained that:

> Amazon has engaged in extensive anticompetitive conduct in its treatment of third-party sellers.  Publicly, Amazon describes third-party sellers as 'partners.'  But internal documents show that, behind closed doors, the company refers to them as 'internal competitors.'  Amazon's dual role as an operator of its marketplace that hosts third-party sellers, and a seller in that same marketplace, creates an inherent conflict of interest.[60]

138.   In part, the NFL's decision to enter into the Merchandise Agreement that benefits and protects Fanatics, confirms Amazon's power over retail sales to end-user consumers.  Rather than battling with its dominant e-commerce rival, Amazon, Fanatics benefitted from Amazon's conduct.  For example, on March 24, 2021, Amazon alerted Casey's that it would only allow "authorized" retailers to sell NFL Licensed Products on its website.  Then, enforcing the NFLP's TPOM Policy, Amazon began to de-list Casey's and others' legitimately-purchased NFL Licensed Products on or around May 24, 2021.

### C.   Fanatics' Monopoly or Market Power

139.   As Fanatics' size and power has grown, so has its market share and, in particular, its market share of NFL Licensed Products sold through online channels.  Fanatics' sales of NFL Licensed Products accounts for nearly one-third of the $3 billion estimated total sales of NFL Licensed Products for 2020, of which a majority were sold online through Fanatics' websites.  Because online sales account for much less than half of all retail sales,[61] a conservative estimate would attribute substantial market power to Fanatics for e-commerce sales of NFL licensed products.[62]

---

[59] *Id.*

[60] *Id.*

[61] Some sources estimate online sales account for roughly 11-15% of all retail sales. *See, e.g.*, https://www.statista.com/statistics/187439/share-of-e-commerce-sales-in-total-us-retail-sales-in-2010/ (last visited October 7, 2021).

[62] As Defendant Fanatics is a privately-held entity and has not released to the public market share-related information in any materially significant or meaningfully helpful way, Defendant Fanatics' market share information is not known with specificity to Plaintiff at this time.  However, discovery

---

140.    Fanatics likely has or is substantially close to having a monopoly share of the market for sales of NFL Licensed Products conducted online.  In addition to its own online retail website Fanatics.com, Fanatics currently operates the e-commerce websites of a majority of the major professional sports leagues, including the NFL and a majority of the NFL's member teams.  NFL websites operated by Fanatics include, but are not limited to:

- Fanatics.com
- Jetsshop.com
- Ramsfanshop.com
- Shop.azcardinals.com
- Shop.buccaneers.com
- Shop.chiefs.com
- Shop.clevelandbrowns.com
- shop.denverbroncos.com/
- Shop.giants.com
- Shop.houstontexans.com
- Shop.jaguars.com
- Shop.neworleanssaints.com
- Shop49ers.com
- Store.washingtonfootball.com

- nflshop.com
- Shop.miamidolphins.com
- Shop.colts.com
- Store.chicagobears.com
- Shop.panthers.com
- Shop.chargers.com
- Shop.atlantafalcons.com
- Footballfanatics.com
- Shop.detroitlions.com
- Shop.baltimoreravens.com
- Proshop.seahawks.com
- Proshop.patriots.com
- Store.philadelphiaeagles.com

However, even if Fanatics cannot be said to have general monopoly power in the NFL Licensed Products market, because the NFLP granted Fanatics the right to operate the NFL's Amazon "storefront," while other previously competing entities were denied access to Amazon's TPOM, Fanatics was granted actual or near monopoly power over e-commerce sales of NFL Licensed Products conducted on Amazon.

141.    By the fall of 2017, Fanatics was recognized as "one of the world's largest licensed

---

will likely shed light as to both Defendant NFLP's and Defendant Fanatics' respective market shares, as well as how Defendant Fanatics' market share impacts others.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF ANTITRUST AND UNFAIR COMPETITION LAWS

sports merchandise retailers" and that, with respect to its aspirations outside of the U.S, it hopes to "implement[] a strategy to replicate its *home market dominance* and capabilities in licensed sports merchandise . . . ."[63]

142.    After it raised approximately $350 million in August 2020, Fanatics purchased "hard good manufacturer" WinCraft in December 2020.[64]  WinCraft, a manufacturer of NFL Licensed Hardgoods, including, but not limited to, flags, banners, wall art, pennants, decals, and lanyards, generates $100 million in annual revenue, employs over 500 staff, and has client relationships with all of North America's major leagues and teams.[65]  Gene Goldberg, a former NFL licensing executive, described WinCraft as "the biggest fish" as WinCraft "has nearly every major license across sports" and its "product line of novelties includes pennants, bumper stickers, koozies, towels, magnets, banners and signs."[66]  WinCraft now operates under the "Fanatics Brands division."[67]

143.    In addition to helping Fanatics dominate the Hardgoods side of the NFL Licensed Products business, Fanatics' purchase of WinCraft was apparently also part of the Defendant's "focus[] on accelerating its vertical commerce business and strengthening its manufacturing and distribution businesses."[68]

## VI.    DEFENDANTS WILLFULLY AND IMPROPERLY ACQUIRED OR MAINTAINED THEIR MONOPOLY POWER THROUGH ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT

### A.    NFLP

144.    NFLP engaged in a variety of conduct designed to lessen competition, increase prices,

---

[63] *See* https://www.sportspromedia.com/analysis/how-fanatics-is-taking-its-v-commerce-model-global (last visited June 15, 2021) (emphasis added).

[64] *See* https://www.sportspromedia/com/news/fanatics-wincraft-acquisition-hard-goods-non-apparel (last visited June 14, 2021).

[65] *See id.*

[66] *See* https://www.bizjournals.com/twincities/news/2020/12/07/sportswear-maker-fanatics-acquiring-wincraft.html (last visited June 14, 2021).

[67] *See* https://www.postbulletin.com/business/manufacturing/6796519-Winonas-WinCraft-sold-to-Florida-based-fanatics (last visited June 14, 2021).

[68] *See id.*

---

reduce availability, reduce output, and unfairly advantage and aggrandize itself with respect to e-commerce sales of NFL Licensed Products on Amazon's TPOM, separate and apart from having a superior product, business acumen, or historic accident.

145.    The monopoly power of NFLP (as extended into the downstream market for e-commerce sales of NFL Licensed Products on Amazon's TPOM) was willfully acquired or maintained through the following:

- Its decision to not renew at least one NFL Intellectual Property License so as to eliminate competitors of Fanatics in the NFL Licensed Products market, in violation of 15 U.S.C. § 2;

- NFLP's decision to place Fanatics at an advantage in comparison to its competitors by granting to Fanatics the exclusive right to operate NFL's Amazon "storefront" for retailing NFL Licensed Products on Amazon's TPOM; and

- By entering into agreements with Amazon to have the products of those not approved or authorized by the NFLP (through the "AMRA" process) to retail NFL Licensed Products de-listed from Amazon's TPOM.

146.    NFLP's intent to acquire and maintain monopoly power through anticompetitive and exclusionary conduct is further established through its efforts to create and then selectively enforce its TPOM Policy.  The TPOM Policy was designed to and prevented Plaintiff and other non-licensees from selling NFL Licensed Products on Amazon's TPOM.  In addition to an implicit threat of non-renewal, the NFLP also required its licensees to prevent Casey's and others from selling on Amazon's TPOM, by threatening licensees with its power to prohibit licensees from selling NFL Licensed Products to "any retailer" if the NFL believes that such sales would be detrimental to the "NFL's brand image."  For example:

- On August 1, 2020, a representative of FOCO messaged Plaintiff through Facebook, stating:  "***The league*** has called your company out on selling FOCO's gaiter scarves as a 3rd party marketplace seller.  This is not allowed.  Please remove listings on this item to avoid further issues."

- On August 4, 2020, NFL-Licensed FOCO requested that Plaintiff remove its products listed for sale on Amazon, using the TPOM Policy as the basis for its request.

- On August 5, 2020, a representative of Little Earth Productions, emailed Casey's Lisa Ford, asking "to please tell us where these large quantities [of Curve Wallets] are going?  We don't want to steal this business and we want to continue to partner with you, but we just need to find out where they will be selling *because we need to advise the NFL* of where our NFL items are retailing."

Ultimately, Defendant NFLP's market, if not monopoly, power was confirmed in part by Amazon referring to the "new agreement" it had with the NFL in its warning letter it sent to Casey's prior to the de-listing efforts it took against Casey's.

**B.   Fanatics**

147.   Fanatics has also engaged in a variety of conduct designed to lessen competition, increases prices, reduce availability, reduce output, and unfairly advantage and aggrandize itself with respect to e-commerce sales of NFL Licensed Products on Amazon's TPOM, separate and apart from having a superior product, business acumen, or historic accident.

148.   The monopoly power of Fanatics over e-commerce sales of NFL Licensed Products on Amazon's TPOM was willfully acquired or maintained, but not through any legitimate pricing, quality, supply chain, technological, or other types of advantages or consumer demand, in violation of 15 U.S.C. § 2.

149.   For example, Fanatics acquired and maintained its monopoly or market power over e-commerce sales of NFL Licensed Products on Amazon's TPOM through anticompetitive, monopolistic, and exclusionary means, including, but not limited to, the following examples:

- By selling a 3% pre-public equity stake in itself to the NFL, for which the NFLP acts as an agent with respect to the League's Intellectual Property concerns[69];

---

[69] Fanatics thus benefits from the circumstance of having an equity holder, the NFL, in charge of its agent, the NFLP, from which Fanatics has received one or more NFL Intellectual Property licenses.

- By having itself incorporated into the "Merchandise Agreement"—entered into between the NFLP and Amazon—to sell NFL Licensed Products on Amazon, which provided Fanatics the advantaged position over other e-commerce NFL Licensed Products retailers concerning the right to operate the NFL's Amazon "storefront";

- By enforcing the terms of the TPOM Policy to pressure NFL Intellectual Property licensees to stop selling to companies like Casey's seeking to sell NFL Licensed Products on TPOM; and

- By pressuring its own Hardgoods division (WinCraft) to communicate with representatives of Casey's that Casey's supply of WinCraft-based NFL Licensed Hardgoods could be threatened if Casey's did not stop selling such products on Amazon's TPOM.

150. Fanatics exploited for its own benefit the TPOM-related restrictions faced by its competitors for retail sales of NFL Licensed Products on Amazon.

151. Further, Fanatics engaged in efforts to prevent entities from selling on Amazon's TPOM, even when the entity had been approved by the NFLP as an Approved Marketplace Retailer under "AMRA." This included Fanatics entering into written agreements with licensees, containing provisions apparently similar to that of the ODP and AMRA, which enabled Fanatics to use such licensees to discourage or prevent their respective non-Fanatics customers from retailing NFL Licensed Products on Amazon's TPOM.

152. Despite the NFLP's TPOM Policy, Fanatics was not only placed in the privileged position of having the right to operate the NFL's Amazon "storefront," but it was permitted to "sell *its* products on Amazon."[70]

## VII.   PLAINTIFF IS ENTITLED TO INJUNCTIVE RELIEF

153. Plaintiff Casey's requests that this Court award injunctive relief prohibiting NFLP and Fanatics from enforcing the NFLP's TPOM Policy, which hinders, interferes with, limits, and/or

---

[70] *See* https://magazine.promomarketing.com/article/amazon-will-start-selling-licensed-nfl-merchandise-via-fanatics/ (last visited June 15, 2021) (emphasis added).

prevents Casey's and others similarly situated from selling NFL Licensed Products on Amazon's TPOM without first obtaining written permission from NFLP.

154.    Plaintiff Casey's requests on behalf of itself and all others similarly situated that NFLP and Fanatics cease, stop, abandon, and otherwise desist from enforcing the NFLP's TPOM Policy, as found in the AMRA, which states in part:  "NFL Properties, LLC ('NFLP') obligates its consumer products licensees ('Licensees') to . . . refrain from selling their NFL licensed products under a third-party URL, without the prior written approval of NFLP."[71]  As reflected in the AMRA, "third-party URL[s]" specifically concern "the Amazon.com marketplace."[72]  Thus, the requested relief here is directed to hindering, limiting, preventing, or prohibiting Casey's and others similarly situated from selling NFL Licensed Products on Amazon's TPOM.

155.    The NFLP, through its TPOM Policy, also seeks to limit the numbers of those who are permitted to sell on Amazon's TPOM and to limit those who can sell to others seeking to retail NFL Licensed Products on Amazon's TPOM.

156.    NFLP and Fanatics have caused Plaintiff and the other Class Members (as defined below) irreparable harm, which cannot be remedied completely by financial compensation to Casey's and other similarly situated Class Members.  Because the efforts by NFLP and Fanatics have denied Plaintiff Casey's and others the ability to run a particular type of business, one that benefits from the features, services, technologies, and widespread consumer access associated with selling on Amazon's TPOM, legal remedies are inadequate, and the requested equitable relief is justified.  For example, businesses operating on Amazon's TPOM benefit from Amazon's consumer and transaction focused tools, which include credit card processing, product fulfillment, product return, anti-theft and other security, efficiency enhancement, and order and inventory tracking features, services, and technologies.  In addition, in many circumstances, Amazon's order and inventory tracking technologies communicate and integrate with that used internally by small businesses (referred to by Casey's as "synchronized flow technology"), which help facilitate orders and prevent small businesses

---

[71] *See* NFL Properties LLC Approved Marketplace Retailer Application for the "2021 NFL season," which runs "from execution date through March 31, 2022," at p. 1.

[72] *See id.*

from offering for sale product for which they lack inventory.  Because customer service requirements and demands are comparatively greater in the retail environment (compared to the wholesale environment), Amazon's features, services, and technologies become increasingly important for companies seeking to transition to or add a retail focus to its business.  Moreover, so long as the participating businesses follow Amazon's qualifying rules, the nature and format of Amazon's TPOM allow a small business to compete against larger enterprises based on product features, price, and other indicia of value, to the consumers' ultimate benefit.  Further, an injunction is justified as the conduct, acts, and practices of NFLP and Fanatics have harmed competition and are designed to drive Plaintiff and other Class members out of the business of e-commerce retail sales of NFL Licensed Products.

## VIII.   CLASS ACTION ALLEGATIONS

### A.   Class Definition

157.   Plaintiff brings this action seeking equitable relief under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1—2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, on behalf of itself and, under Federal Rules of Civil Procedure 23(a) and (b), on behalf of the following Class:

> All entities or persons in the United States (including its territories and the District of Columbia) prohibited from selling NFL Licensed Products through Amazon's Third Party Online Marketplace due to the NFLP's implementation of its third-party online marketplace policy, as reflected in the NFLP's Approved Marketplace Retailer Application, from May 24, 2021, through the present.

158.   The Class excludes the Defendants, any entity in which Defendants have a controlling interest, any individual or entity that has a controlling interest in the Defendants, as well as any of their respective officers, directors, legal representatives, successors, assigns, and any of their co-conspirators, including Amazon.

159.   Plaintiff reserve the right to revise the class definition based upon information learned through discovery.

### B.   Class Certification Requirements Under Rule 23

160.   The Rule 23 requirements are satisfied as to the Class for very similar reasons.  In the interests of efficiency, this Complaint addresses the Class jointly.

161. **Numerosity: Rule 23(a)(1)**. The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. Plaintiffs are informed and believe that the Class members number in the hundreds. Further, the Class is readily identifiable from information available and in the possession of Defendants. Class members may be notified of the pendency of this action by recognized methods, which may include U.S. mail, electronic mail, internet postings, social media, and publication.

162. **Commonality: Rule 23(a)(2)**. This action involves significant common question of law and fact, including, but not limited to:

    a.    Existence and scope of the conspiracy;

    b.    Impact of the conspiracy; and

    c.    Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

163. **Typicality: Rule 23(a)(3)(i)**. Plaintiff's claims are typical of those of the members of the Class whom it seeks to represent. Plaintiffs' claims are typical because Plaintiffs and each Class member were forbidden from selling NFL Licensed Products on TPOMs and thus were similarly injured as a direct and proximate result of Defendants' same wrongful practices. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members and are based upon the same legal theories as the claims of the other Class members. Plaintiff and Class Members were damaged by the same wrongful conduct of Defendants.

164. **Adequacy: Rule 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiffs have retained counsel competent and experienced in complex class action litigation, including antitrust class actions. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

165. **Declaratory and Injunctive Relief: Rule 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making

appropriate final injunctive relief and declaratory relief, as described below, with respect to each Class as a whole.

166.   **Predominance: Rule 23(b)(3).**   The common questions of law and fact predominate over any questions individual to the Class members.

167.   **Superiority: Rule 23(b)(3).**   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties will be encountered in the management of this class action.   Such treatment will permit a large number of similarly situated entities and persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.   The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not be practicably pursued individually, substantially outweighs potential difficulties in management of this class action.

168.   Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments.   Individualized litigation further increases the delay and expense to all parties and the court system.   By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

169.   Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

170.   **Ascertainability.**   The Class members are readily identifiable from Defendants' records.   Defendants maintain records and historical data of which individuals purchased NFL Licensed Sports Products online from Defendants.   Because the purchases were made online, Defendants necessarily collect and retain the name of each purchaser, the item(s) purchased, the amounts paid, and the purchasers' billing and shipping addresses.   In addition, the nature of e-commerce is such that all class members purchased NFL Licensed Sports Products online using some form of electronic payment (e.g., credit card, gift card, PayPal, etc.).   Accordingly, even if Defendants themselves did not maintain records sufficient to identify Class members, almost all class members will have access to electronic transactional records that can be used to prove class membership and a

qualifying purchase at the appropriate stage.

## IX.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Sherman Act § 1 – Conspiracy in Restraint of Trade
### (As to All Defendants)

171.    Plaintiff hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

172.    Defendants' conduct violates Section 1 of the Sherman Act, which prohibits every "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," whether foreign or domestic.  15 U.S.C. § 1.

173.    Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in restraint of trade in violation of § 1 of the Sherman Act to unlawfully restrict competition between online retailers of NFL Licensed Products on Amazon's TPOM.  As part of this conspiracy, Defendants undertook a coordinated campaign designed to exclude Plaintiff and other similarly situated competitors from selling NFL Licensed Products on Amazon's TPOM and otherwise disadvantage competing retailers.  By these actions, Defendants conspired to artificially fix, raise, stabilize, or maintain the prices of these products, to end price competition, to limit or reduce product availability, to limit or reduce output, and to limit or reduce competition in the U.S. in violation of § 1 of the Sherman Act.  The conduct of Defendants described throughout this Complaint constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  In the alternative, the conduct violates Section 1 under the "quick look" or "rule-of-reason" standard because Defendants' agreements harmed competition in the relevant product market of the U.S. Amazon-based third-party online retail market for Products bearing the Intellectual Property of the NFL or any NFL Team.  The agreements provided no procompetitive benefits and, even if they did, the anticompetitive effects of the agreements substantially outweighed any asserted procompetitive effects and/or were not the least restrictive method to achieve any such procompetitive benefits.  These agreements serve no legitimate or pro-competitive purpose that could justify their anti-competitive effects.  They unreasonably restrain competition.  And the restraints described herein are substantially more restrictive than

necessary to achieve any procompetitive ends.

174.   Defendants' conduct affects a substantial volume of interstate commerce.

175.   Defendants' conduct has substantial anticompetitive effects, including but not limited to decreased output, stabilized or increased prices, and diminished quality of service.

176.   Plaintiff and the Class members have been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were meant to prevent.  Plaintiff and the Class members have suffered and continue to suffer damages and irreparable injury.

177.   On behalf of itself and Class Members, Plaintiff seeks injunctive relief barring the Defendants from engaging in the anticompetitive conduct alleged herein, under Clayton Act § 16, 15 U.S.C. § 26.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**SECOND CAUSE OF ACTION**
**Sherman Act § 2 – Monopolization**
**(As to All Defendants)**

178.   Plaintiff hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

179.   Defendants' conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation] [of] any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2.

180.   The U.S. Amazon-based third-party online retail market for Products bearing the Intellectual Property of the NFL or any NFL Team is a valid antitrust market.

181.   NFLP possesses monopoly power over the U.S. Amazon-based third-party online retail market for Products bearing the Intellectual Property of the NFL or any NFL Team.

182.   Fanatics possesses monopoly power over the U.S. Amazon-based third-party online retail market for Products bearing the Intellectual Property of the NFL or any NFL Team.

183.   NFLP has unlawfully acquired and/or maintained monopoly power over the U.S. Amazon-based retail market for Products bearing the Intellectual Property of the NFL or any NFL Team through the anti-competitive acts described herein.

184.    Fanatics has unlawfully acquired and/or maintained monopoly power over the U.S. Amazon-based retail market for Products bearing the Intellectual Property of the NFL or any NFL Team through the anti-competitive acts described herein

185.    Defendants' conduct affects a substantial volume of interstate and foreign commerce.

186.    Defendants' conduct has substantial anti-competitive effects, including but not limited to: reducing the number of entities on Amazon's platform that compete in the market for retail sales of NFL Licensed Products; creating a barrier to entry to the market for retailing NFL Licensed Products; artificially decreasing the selection, product quality, and service quality associated with retailing NFL Licensed Products; establishing a single licensee as the dominant and exclusive or near-exclusive e-commerce retailer of NFL Licensed Products on Amazon; interfering with the types of and quality of NFL Licensed Products that Plaintiff and Class members can retail on Amazon's TPOM; and interfering with the use of phrases associated with the NFL and its member Teams when promoting unaffiliated e-commerce destinations via, for example, Google AdWords or similar search technologies.

187.    As entities and individuals that previously retailed but have now been prevented from or hindered in retailing NFL Licensed Products on Amazon's TPOM, Plaintiff Casey's and the Class members have been directly and proximately harmed in their respective businesses or properties by the Defendants' anticompetitive conduct, which is of a type and has occurred in a manner that the antitrust laws were intended to prevent.

188.    Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury by Defendants' anticompetitive conduct.  As described herein, the damages and irreparable injury suffered by Plaintiff and the Class members cannot be completely relieved through remedies at law.  Plaintiff Casey's and the Class members' damages and irreparable injury will continue and will not abate until this Court issues an injunction ending the Defendants' anticompetitive conduct.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### THIRD CAUSE OF ACTION
### Sherman Act § 2 – Attempted Monopolization
### (As to All Defendants)

189.　Plaintiff hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

190.　Defendants' conduct violates Section 2 of the Sherman Act, which prohibits the "attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations . . . ."  15 U.S.C. § 2.

191.　The U.S. Amazon-based third-party online retail market for Products bearing the Intellectual Property of the NFL or any NFL Team is a valid antitrust market.

192.　The conduct engaged in by Defendants as further described herein was anticompetitive in that it prevented the normal competitive forces from operating, which resulted in the advantaging of Fanatics over all or nearly all other licensees and resulted in the allowance of one or only a very few selected entities from effectively retailing NFL Licensed Products on Amazon.  It was additionally anticompetitive in that it thwarted or hindered Plaintiff and the Class members from selling NFL Licensed Products that had been previously listed for retail sale on Amazon's TPOM by de-listing such products from Amazon's website.

193.　NFLP possessed the specific intent to monopolize the relevant market as alleged herein.

194.　Fanatics possessed the specific intent to monopolize the relevant market as alleged herein.

195.　Defendants' course of conduct had the dangerous probability of causing Defendants to achieve monopoly power over the market for U.S. e-commerce retail sales of NFL Licensed Products on Amazon.  By such conduct, Defendants caused Fanatics to achieve the status of the operator of the NFL's "storefront" on Amazon to the exclusion of all or most others and resulted in the de-listing of products by those like Plaintiff previously engaged in retail sales of NFL Licensed Products on Amazon.

196.　Through their course of conduct, Defendants attempted to monopolize the U.S. Amazon-based e-commerce market for NFL Licensed Products, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

197.    Defendants' conduct affects a substantial volume of interstate and foreign commerce.

198.    Defendants' conduct has substantial anti-competitive effects.

199.    As entities and individuals that previously retailed but have now been prevented from or hindered in retailing NFL Licensed Products on Amazon's TPOM, Plaintiff Casey's and the Class members have been directly and proximately harmed in their respective businesses or properties as alleged herein by the Defendants' anticompetitive conduct, which is of a type and has occurred in a manner that the antitrust laws were intended to prevent.

200.    Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury by Defendants' anticompetitive conduct.  As described herein, the damages and irreparable injury suffered by Plaintiff and the Class members cannot be completely relieved through remedies at law.  Plaintiff Casey's and the Class members' damages and irreparable injury will continue and will not abate until this Court issues an injunction ending the Defendants' anticompetitive conduct.

## FOURTH CAUSE OF ACTION
### Sherman Act § 2 – Conspiracy to Monopolize
### (As to All Defendants)

201.    Plaintiff hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

202.    Defendants' conduct violates Section 2 of the Sherman Act, which prohibits the "combin[ation] or conspir[acy] with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ."  15 U.S.C. § 2.

203.    Defendants engaged in concerted action that included overt acts that furthered the conspiracy entered into with the specific intent to achieve an unlawful monopoly.

204.    The U.S. Amazon-based third-party online retail market for Products bearing the Intellectual Property of the NFL or any NFL Team is a valid antitrust market.

205.    Defendants entered into and engaged in a continuing combination, conspiracy, and/or agreement to acquire, maintain, and/or enhance Fanatics' monopoly in violation of Section 2 of the Sherman Act (15 U.S.C. § 2) by engaging in the conduct alleged herein.

206.    Defendants engaged in these acts with the specific intent of eliminating competition on the merits for retailing NFL Licensed Products on Amazon, and thereby installing and protecting Fanatics as the sole or dominating force in e-commerce sales of NFL Licensed Products, including the e-commerce sales of NFL Licensed Products on Amazon, a monopoly established coincident with Amazon obtaining the rights to stream "Thursday Night Football."  Defendants' conduct violates Section 2 of the Sherman Act (15 U.S.C. § 2).

207.    Defendants' conduct affects a substantial volume of interstate and foreign commerce.

208.    Defendants' conduct has substantial anti-competitive effects as alleged herein.

209.    Plaintiff Casey's and the Class members have been directly and proximately harmed in their respective businesses or properties as alleged herein by the Defendants' anticompetitive conduct, which is of a type and has occurred in a manner that the antitrust laws were intended to prevent.

210.    Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury by Defendants' anticompetitive conduct.  As described herein, the damages and irreparable injury suffered by Plaintiff and the Class members cannot be completely relieved through remedies at law.  Plaintiff Casey's and the Class members' damages and irreparable injury will continue and will not abate until this Court issues an injunction ending the Defendants' anticompetitive conduct.

## FIFTH CAUSE OF ACTION
### Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq.*) – Conspiracy in Restraint of Trade
### (As to All Defendants)

211.    Plaintiff hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

212.    Defendants' conduct, acts, and practices, as alleged herein, violate California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq.*), which prohibits, among other things:  the combination of capital, skill, or acts by two or more persons to restrain trade or commerce; to limit or reduce production, or increase the price of merchandise; to prevent competition in manufacturing, making, transportation, sale or purchase of merchandise; to make or enter into or execute or carry out any contracts, obligations, or agreements of any kind or description, by which they pool, combine, or

directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected; or otherwise to prevent market competition.  Cal. Bus. & Prof. Code §§ 16720, 16726.

213.    Under California's Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

214.    The U.S. Amazon-based third-party online retail market for Products bearing the Intellectual Property of the NFL or any NFL Team is a valid antitrust market.

215.    Defendant NFLP has entered into agreements with or has otherwise conspired with Defendant Fanatics and non-defendant Amazon in order to unreasonably restrict competition in the U.S. Amazon-based third-party online retail market for Products bearing the Intellectual Property of the NFL or any NFL Team.  Approximately one week after the announcement of the NFL and Amazon entering into a *Thursday Night Football* "Streaming Rights Deal," Defendant NFLP entered into a "Merchandise Agreement" with non-defendant Amazon, which "incorporated" Defendant Fanatics, providing—to the exclusion of other retailers—Defendant Fanatics with the opportunity to operate and sell its own products through the NFL's "storefront" on Amazon.

216.    These agreements apparently included TPOM Policy enforcement mechanisms or otherwise empowered Amazon to de-list NFL Licensed Products from its website, as suggested by Amazon's reference to "a new agreement with the NFL . . . ."  On or around May 24, 2021, in accordance with this "new agreement," Amazon began to remove NFL Licensed Products, which were previously listed by Casey's and other retailers, from Amazon's TPOM.

217.    Defendants' conduct, acts, and practices have caused substantial anti-competitive effects as alleged herein, including limited or reduced availability of product, limited or reduced output, limited or reduced innovation, poorer quality of product, poorer quality of customer service, and fewer market participants.

218.    This conduct and these agreements have no legitimate or pro-competitive purpose or effect and unreasonably restrain competition in the U.S. market for Amazon-based third-party online retailing of Products bearing the Intellectual Property of the NFL or any NFL Team.

219.     Defendants' conduct has harmed and is continuing to harm Plaintiff, which, as a direct result of Defendants' anti-competitive conduct, has been prohibited, prevented, or hindered from operating an Amazon TPOM-based business that retails NFL Licensed Products; benefiting from the services, features, convenience, and widespread audience associated with running an Amazon TPOM-based business concerning e-commerce sales of NFL Licensed Products; and retailing NFL Licensed Products over Amazon's TPOM.

220.     Plaintiff may bring this action under California's Cartwright Act because both Defendants have offices and continuing operations in California, including Defendant Fanatics' "co-headquarter[s]," "west coast headquarters," or "west coast innovation center" located in San Mateo, California, and Defendant NFLP's office located in Culver City, California.  Further, Defendant Fanatics' California office is responsible for, in part, making or implementing decisions relating to data, technology, and e-commerce platforms, which lie at the heart of this matter.  In addition, Defendant Fanatics operates several retail locations in California, many affected sales occurred in or were transacted in California, many affected customers reside in California, and overt acts taken in furtherance of the Defendants' anticompetitive scheme took place in California.

221.     Plaintiff Casey's and the Class members have been directly and proximately harmed in their respective businesses or properties, as alleged herein, by the Defendants' anticompetitive conduct, which is of a type and has occurred in a manner that California's Cartwright Act was intended to prevent.

222.     Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury by Defendants' anticompetitive conduct.  As described herein, the damages and irreparable injury suffered by Plaintiff and the Class members cannot be completely relieved through remedies at law.  Plaintiff Casey's and the Class members' damages and irreparable injury will continue and will not abate until this Court issues an injunction ending the Defendants' anticompetitive conduct.

**SIXTH CAUSE OF ACTION**
**Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq.*) – Group Boycott in Restraint of Trade**
**(As to All Defendants)**

223. Plaintiff hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

224. Defendants' conduct, acts, and practices, as alleged herein, violate California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq.*), which prohibits, among other things: the combination of capital, skill, or acts by two or more persons to restrain trade or commerce; to limit or reduce production, or increase the price of merchandise; to prevent competition in manufacturing, making, transportation, sale, or purchase of merchandise; to make or enter into or execute or carry out any contracts, obligations, or agreements of any kind or description, by which they pool, combine, or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, such that its price might in any manner be affected; or otherwise to prevent market competition. Cal. Bus. & Prof. Code §§ 16720, 16726.

225. Under California's Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

226. The U.S. Amazon-based third-party online retail market for Products bearing the Intellectual Property of the NFL or any NFL Team is a valid antitrust market.

227. At least in May 2017 when the NFL agreed to make a 3% equity investment in Fanatics and again in or around March 2021 when Defendant Fanatics was "incorporated" into the NFLP-Amazon "Merchandise Agreement," which bestowed on Fanatics the status of operator of the NFL's Amazon "storefront" to the exclusion of others, Defendant NFLP and Defendant Fanatics "pool[ed], combine[d] or directly or indirectly unite[d] [their] interests" such that a Cartwright Act "trust" was formed that restricted trade or commerce under Cal. Bus. & Prof. Code § 16720.

228. Further, including through the ODP and the AMRA and in exchange for certain rights associated with NFL Intellectual Property, Defendant NFLP entered into various agreements and arrangements with licensees, whereby the NFLP's licensees were obligated to monitor, limit, restrict, or control the conduct of retailers, including the taking of steps to prevent or discourage retailers from

retailing NFL Licensed Products on Amazon's TPOM, unless approved to do so by the NFLP, in accordance with the NFLP's TPOM Policy—even though the NFLP itself had no privity with these retailers. In enforcing its TPOM Policy, including through its ODP and AMRA agreements, Defendant NFLP restrained trade, limited or reduced production of merchandise, or prevented competition in manufacturing, making, transportation, sale, or purchase of merchandise to the benefit and advantage of its equity investment and united interest—Defendant Fanatics in violation of California's Cartwright Act (Cal. Bus. & Prof. Code §§16720, 16726).

229.     In addition, through a similar strategy as that contemplated by Defendant NFLP within the ODP and the AMRA, Defendant Fanatics entered into agreements and arrangements with wholesalers or NFL Intellectual Property licensees, including WinCraft (before it was acquired by Fanatics) and Logo Brands. As communicated by representatives of Logo Brands, under such an agreement, Logo Brands would no longer or, at minimum, threatened not to supply Casey's, so long as Casey's continued to sell NFL Licensed Products to a customer that listed such products for sale on Amazon's TPOM.

230.     Similar to the conduct, acts, and practices engaged in by Defendant NFLP, Defendant Fanatics sought to have those with whom it entered into agreements—or that were otherwise subject to its influence—monitor, limit, restrict, or control the conduct of retailers (with which Fanatics did not have such privity) in order to prevent or discourage those retailers from competing with Fanatics by retailing NFL Licensed Products on Amazon's TPOM. Through agreements entered into with wholesalers or NFL Intellectual Property licensees (like Logo Brands) or otherwise through the leveraging of Defendant Fanatics' influence as a major purchaser of these wholesalers' or licensees' products, Defendant Fanatics restrained trade, limited or reduced production of merchandise, or prevented competition in manufacturing, making, transportation, sale, or purchase of merchandise in violation of California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, 16726).

231.     Defendants' conduct, acts, and practices have caused substantial anti-competitive effects as alleged herein, including limited or reduced availability of product, limited or reduced output, limited or reduced innovation, poorer quality of product, poorer quality of customer service, and fewer market participants.

232.    This conduct and these agreements have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the U.S. market for Amazon-based third-party online retailing of Products bearing the Intellectual Property of the NFL or any NFL Team.  Defendants' conduct, acts, and practices have harmed and are continuing to harm Plaintiff, which, as a direct result of Defendants' anti-competitive conduct, acts, and practices, has been prohibited, prevented, or hindered from operating an Amazon TPOM-based business that retails NFL Licensed Products; from benefiting from the services, features, convenience, and widespread audience associated with running an Amazon TPOM-based business concerning e-commerce sales of NFL Licensed Products; and from retailing NFL Licensed Products over Amazon's TPOM.

233.    Plaintiff may bring this action under California's Cartwright Act because both Defendants have offices and continuing operations in California, including Defendant Fanatics' "co-headquarter[s]," "west coast headquarters," or "west coast innovation center" located in San Mateo, California, and Defendant NFLP's office located in Culver City, California.  Further, Defendant Fanatics' California office is responsible for, in part, making or implementing decisions relating to data, technology, and e-commerce platforms, which lie at the heart of this matter.  In addition, Defendant Fanatics operates several retail locations in California, many affected sales occurred in or were transacted in California, many affected customers reside in California, and overt acts taken in furtherance of the Defendants' anticompetitive scheme took place in California.

234.    Plaintiff Casey's and the Class members have been directly and proximately harmed in their respective businesses or properties, as alleged herein, by the Defendants' anticompetitive conduct, which is of a type and has occurred in a manner that California's Cartwright Act was intended to prevent.

235.    Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury by Defendants' anticompetitive conduct.  As described herein, the damages and irreparable injury suffered by Plaintiff and the Class members cannot be completely relieved through remedies at law.  Plaintiff Casey's and the Class members' damages and irreparable injury will continue and will not abate until this Court issues an injunction ending the Defendants' anticompetitive conduct.

## PRAYER FOR RELIEF

WHEREFORE, on behalf of itself and the Class Members, Plaintiff respectfully requests that the Court Order the following:

a.      certification of this case as a class action on behalf of the Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), appointment of Plaintiff as class representative, and appointment of its attorneys as Class Counsel;

b.      an order providing such equitable relief as necessary to correct the anticompetitive market effects caused by NFLP's and Fanatics' unlawful conduct, consistent with the following:

> Neither Defendant NFLP nor Defendant Fanatics shall implement or enforce any policy, whether drafted, implemented, or enforced by Defendant NFLP or Defendant Fanatics, which hinders, limits, prevents, or prohibits an individual or entity from selling legitimately-purchased NFL Licensed Products, on or through a third-party marketplace, including that operated by Amazon, even in the event that such an individual or entity has not previously obtained written permission from Defendant NFLP or Defendant Fanatics to do so;

c.      an order declaring that Defendants' actions violate the antitrust laws;

d.      reasonable costs of this action, including but not limited to attorneys' fees; and

e.      an award of such other relief that the Court deems reasonable and appropriate.

Dated:  December 21, 2021

CERA LLP

By: /s/Thomas C. Bright
Solomon B. Cera
Thomas C. Bright
595 Market Street, Suite 1350
San Francisco, CA 94105
Telephone: (415) 777-2230
Email: scera@cerallp.com
Email: tbright@cerallp.com

KAPLAN FOX & KILSHEIMER LLP
Robert N. Kaplan (*pro hac vice forthcoming*)
Gregory K. Arenson (*pro hac vice forthcoming*)
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Email: rkaplan@kaplanfox.com
Email: garenson@kaplanfox.com

– and –

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF ANTITRUST AND UNFAIR COMPETITION LAWS

**NEMATZADEH PLLC**
Justin Solomon Nematzadeh (*pro hac vice forthcoming*)
101 Avenue of the Americas, 9th Floor
New York, NY 10013
Telephone: (646) 417-8379
Email: jsn@nematlawyers.com

*Attorneys for Plaintiffs and the Proposed Class*